## WEIANT v. ROCKLAND LAKE TRAP-ROCK CO. et al.

(Supreme Court, Appellate Division, Second Department. May 31, 1901.)

1. BOUNDARIES—DEEDS—DESCRIPTION.
   Deeds describing the eastern boundary of certain lands as being along the east bluff of the steep part of a mountain, and as running along the top of the mountain, indicate an intention to include lands to the bluff or steep part of the mountain.

2. SAME.
   Deeds describing land as running to the top of a certain mountain; thence along the top of the mountain, to certain steep rocks; thence, along such rocks, so as to include all stone that falls from same,—indicate an intention to only convey lands to the top of the mountain.

3. SAME—TRIAL—VIEW.
   Where the evidence in a disputed boundary case is so uncertain that it is impossible to definitely locate the boundary therefrom, it is not error for the trial court to view the locality at the request of the parties, and accompanied by them and their attorneys.

Appeal from trial term, Queens county.

Injunction by Laura A. Weiant against the Rockland Lake Trap-Rock Company and others to restrain the removal of rock therefrom alleged to belong to plaintiff. From a decree in favor of plaintiff, and from an order denying a motion for a new trial, the defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, JENKS, and SEWELL, JJ.

Wilson Brown, Jr., for appellants.
William McCauley, Jr., for respondent.

GOODRICH, P. J. The plaintiff sues to enjoin the defendants from blasting out and removing stone from land which she claims to own at Hook Mountain, near Rockland Lake, and to compel the removal therefrom of several hundred feet of iron water pipe, which they have laid thereon. The defendants deny the plaintiff's ownership of the land, and allege that the defendants Foss and Conklin are the owners and the defendant company the lessee thereof, and of other property between the plaintiff's premises and the river. The controversy between the parties grows out of the difficulty of defining the location of the dividing line between their respective properties, the plaintiff alleging that the line runs along the east bluff of the steep part of the mountain, so as to include the entire top of the bluff, while the defendants claim that it runs further to the westward, and along the flat top of the bluff, so as to embrace within their property a strip lying between the edge of the bluff on the east and the defendants' land on the west. The issues were tried before Mr. Justice Garretson, and the defendants appeal from the judgment entered on his decision in favor of the plaintiff. They also appeal from an order made by the same justice at Queens special term denying a motion for a new trial on the ground of newly-discovered evidence.

The first finding of fact relates to the ownership, and reads as follows:

"First. That the plaintiff is and was, at and during the time stated in the complaint, the lawful owner and in actual possession of the lands and premises therein mentioned and described, the easterly line or boundary line whereof runs along the east bluff of the steep part of the mountain, as shown by the irregular or indented red line, marked 'East Bluff of Steep Part of the Mountain,' on plaintiff's map in evidence as Exhibit No. 2, and entitled 'Map of Lands of Mrs. Laura A. Weiant, Near Rockland Lake, Clarkstown, N. Y., Surveyed June, 1897, to May, 1898, by L. Wilson, Surveyor,' and as also shown on plaintiff's Exhibit No. 1, entitled, 'Map of the East Bluff of the Steep Part of the Mountain.'"

The first question before us is whether there was sufficient evidence upon which to base such a finding. William Perry was the owner of the whole mountain, through whom the parties herein derive title. The plaintiff's land consists of three parcels, called the "Wagonhofer," "Drew," and "Dickey" tracts, the Wagonhofer lying to the south, next the Drew, and north of that the Dickey tract. It is not necessary to trace the title to the plaintiff through the several mesne conveyances in evidence. To analyze their descriptions with accuracy, within the bounds of an opinion, is difficult, and by reason of a personal examination of the premises by the trial justice, hereinafter referred to, we think it unnecessary to give more than a general outline. The deed from Finch to Perry was dated January 4, 1812, and conveyed the Wagonhofer tract by the following description: ;

"Beginning at a butternut tree, being the northwest corner of the mountain lot of Dowah Tenure, and runs thence north, forty degrees east, six chains; then north, fifty-eight degrees east, seven chains and thirty-nine links, to the

southeast corner of the old house of the said William Perry; then south, thirty-four degrees and thirty minutes east, thirteen chains, along a line of marked trees, to a heap of stones; then south, sixteen degrees east, three-chains and fifty links; then south, twelve degrees east, four chains and fifty links, to a stone heap; then north, sixty-five degrees west, twenty chains, to the place of beginning; and is bounded on the west and north by the public road, on the east by the lands of the said James W. Finch, on the south by the land of Dowah Tenure,—containing, by estimation, fifteen acres, one rood, and nineteen perches, be the same more or less."

The initial point of the description in the Perry deed is a butternut tree, which long since has disappeared, and the primary difficulty is to determine where this tree was located; the plaintiff contending that it was on the east side of the public road, as the latter now exists, while the defendants contend that it was about $27\frac{1}{4}$ feet further to the westward, and that the road at that place has been changed to the eastward. As the demised premises are described to be bounded on the west and north by the public road, it is more natural to believe that the initial point of description was on the east side of the road than that it was on the west side of the road, upon property not conveyed by the deed.

The southerly line of the description of the Wagonhofer tract in the Perry deed ended at the butternut tree, and is described as running "north, sixty-five degrees west, twenty chains, to the place of beginning"; that is, the butternut stump. Running this line reversely from that stump,—that is, south, 25° east, 20 chains,—we should have no difficulty in arriving at the easterly line of the Wagonhofer tract, if the stump was in the easterly line of the public road as the latter is now located. There is some evidence tending to show that the road has been widened in some places since the Perry conveyance. The defendants find confirmation of this in the fact that the description in the deed from Finch to Perry describes the line from the butternut tree as running, on two courses, "to the southeast corner of the old house of the said William Perry." The ruins of this house are shown on the plaintiff's map to be north and west of the public road. The house, however, was several hundred feet north of the tree. It is difficult to understand why a boundary line would be described as commencing on the easterly side of a public road, and running in a long diagonal direction across the road nearly the full length of the line, a distance of 45 chains, about 1400 feet. Naturally, such a boundary line runs along, and not diagonally across, a public road. The plaintiff's counsel in his brief asserts that it was meant that "this line was intended to run to a point on the south side of the public highway opposite the south-east corner of the old Perry house," and, if we so decide, many of the difficulties in the case disappear.

Evidence as to the change in the width of the road is to be found in the testimony of Wagonhofer, a witness for the plaintiff, who said:

"I don't know of any change in the road that runs along in front of the Methodist Church, only they made it a little wider than it was. I couldn't say just when. They done it at times. Some places it wasn't wider at all, and in some places a little wider. There was a butternut tree in the corner of the Methodist Church lot near the road, but he broke down, and

right behind the church is a chestnut tree. The road there by the church is about the same now as it was years ago, only it is a little better fixed up, and a little wider."

William Perry, a son of Finch's grantee, and 78 years old at the time of the trial, testified that the old Perry house was on the north side of the road, and the Wagonhofer tract on the south and east side of the road; that years ago the road ran 8 or 10 feet in front and south of the house; and that the road is now close to the house, but that this is several hundred feet north of the south line of the Wagonhofer tract, where the butternut tree stood. Ackerson, another witness, stated that he knew of some changes in the road in front of the Wagonhofer and Drew tracts, but did not specify them very clearly, or say that there was any change that he had observed at the place where the butternut tree formerly stood. He said:

"I don't mean to say that the road has been changed in front of the church,—not right opposite the church. The road has been changed from my corner where I live to the top of the hill. That was changed quite a number of years ago,—probably thirty-five years ago. The road was very crooked there. Mr. Fish owned one side, and Mr. Conklin the other, and they got permission to change the road, and they shifted it south, and made it wider."

The map in evidence shows that Conklin owned a plot about 360 feet north of the butternut tree. The witness also said that the butternut tree marked one corner of the church lot, and one corner of the Wagonhofer property, on the east side. According to the map, the church property formed the southwest corner of the Wagonhofer tract.

We have thus a general location of, and evidence that the butternut tree was at, the southwest corner of the Wagonhofer tract, that it was on the east side of the road, and that at this point the road has not been materially changed. Running out the southerly line of the property 20 chains, according to the description, we arrive at a point on the mountain which includes the "bluff of the steep part of the mountain," as found by the court below; and, with this point definitely fixed, there is no difficulty in finding that the disputed tract is within the conveyances to the plaintiff and her predecessors in title. Following the description of the Perry deed in the order in which it is there written, the plaintiff's line runs along the bluff, and ends at a point 20 chains from the butternut tree, so as to include the premises in question. The first deed of the Drew tract which appears in the record was executed by Perry to Knapp in 1828. The description speaks of the eastern boundary as running "northeasterly along the east bluff of the steep part of the mountain." The subsequent deeds all describe it, "on the east, running along the pitch of the mountain." Both sentences would seem to indicate an intention to include the land to the very edge of the bluff or steep part of the mountain, as stated in the first finding of fact. The first deed of the Dickey tract was executed by Perry, in 1828, and in describing the eastern boundary uses the words, "then northeasterly along the east bluff of the steep part of the mountain." The subsequent deed to the plaintiff, in 1897, uses the words, "northeasterly down the pitch of the mountain."

The first exhibit in the defendants' chain of title is the will of William Perry, probated in 1832, in which the testator devised his "stone lot and mountain property" to his wife and children. It is significant that the subsequent deeds use the words, "running * * * to the top of the mountain; thence, along the top of the mountain," "to the foot of the steep rocks; thence northerly along said rocks;" "thence northerly, along said rocks, so as to include all the stone that fell down from the same,"—indicating, with more or less clearness, an intention to convey only to the edge of the mountain.

Our examination of the record has involved a careful tracing out and comparison of the descriptions in the several conveyances by metes and bounds, and we may say that the meaning of these descriptions is not so entirely clear that any court could positively define by reading them the limits of the tracts conveyed. Some of the trees and other monuments mentioned in them have disappeared, and it is impossible to decide, upon the evidence, which particular tree or pile of stones was referred to in some of the deeds, or whether the trees or stones referred to in the oral testimony were the same as those described in the deed. For this reason, doubtless, after the close of the testimony, the learned trial justice, "at the request of the parties and their counsel, and accompanied by them, went upon and examined the property involved in the action, and the boundary lines as claimed by the parties and monuments referred to by the witnesses." The method of his personal examination, and the facts which he ascertained thereby, do not appear upon the record, but must necessarily have been influential factors in his decision, and, unless such decision is at variance with uncontradicted evidence, we may not disturb it.

Analogy may be found in cases where a view of premises in question has been taken by a jury, and in the examination had by commissioners in condemnation proceedings, the effect of which is well stated in 7 Enc. Pl. & Prac. p. 581, where it is said:

"The jury are judges of law and facts, and need not base their conclusions entirely on testimony. They can use their own judgment and knowledge derived from the view, in connection with the testimony of the witnesses, even if, in so doing, they arrive at a conclusion not in accord with the weight of testimony. The true rule is that the jury, in estimating the damages, shall consider the testimony of the witnesses in connection with the facts as they appeared upon the view, and shall ascertain the damages upon the whole case, as thus presented. The view may enable the jury to decide questions which the testimony of witnesses alone, although duly considered, would not. But the fact that they acted on their own judgment, aided to some extent by ocular evidence, does not deprive the court of the right to review their award upon the question of damages."

In Re New York El. R. Co., 12 N. Y. Supp. 858 (the general term of the First department, Van Brunt, P. J., writing), it was held that commissioners of intelligence can gain more information in respect to the value of property to be taken by the erection of a railroad from an inspection than from the evidence of any number of theorists, and that their finding will not be disturbed unless it is clearly apparent that injustice has been done, as that they had over-

looked some material feature in the case; or proceeded upon an erroneous principle, or been influenced by prejudice or passion. We expressed a similar view in Re Staten Island Midland R. Co., 22 App. Div. 366, 48 N. Y. Supp. 274. The rule applies with added force to the present action. No one can read the evidence without seeing the difficulty of locating the butternut tree, and the fences, walls, and monuments, named in the descriptions of the conveyances, or without coming to the conclusion that the case was pre-eminently a proper one for a personal examination of the locality and monuments by the trial justice. Under these circumstances, and bearing in mind the difficulty of locating the property by the descriptions in the deeds to the respective parties, we see no reason to disturb the judgment. None of the appellants' exceptions to the admission or exclusion of evidence is tenable.

A careful examination of the record on the appeal from the order denying the motion for a new trial, on the ground of newly-discovered evidence, has only added to our conviction of the wisdom of the trial justice in personally examining the location. The motion was based on the printed record on the appeal from the judgment, which shows the fact of such personal examination. This fact necessarily influences our judgment as to the propriety of the denial of the motion.

Judgment affirmed, with costs. All concur; HIRSCHBERG, J., in result.

---

(61 App. Div. 202.)

LEGARE v. UNION RY. CO. OF NEW YORK CITY.

(Supreme Court, Appellate Division, First Department. May 17, 1901.)

STREET RAILROADS—LIABILITY FOR INJURY TO PASSENGER CROSSING STREET.
Plaintiff's intestate, while attempting to cross a street, was injured by defendant's street car. Deceased, before crossing, saw the car approaching, about 75 feet away, and when it was about 15 feet from deceased, who was then in the middle of the track, the motorman increased the speed of the car. There was evidence that, if the motorman had checked the car when deceased started to cross the track, he would have crossed in safety. *Held,* that a verdict for plaintiff would not be disturbed, the question of negligence being for the jury.

Appeal from trial term.