MASON, Respondent, v. BRAUGHT, Appellant.

(146 N. W. 687.)

1. Surveys—Boundaries—Location of Corner—Section Line—Sufficiency of Evidence.

Evidence in an action to determine the identity of a quarter section of land in Eureka township, held sufficient to sustain a finding that a corner known as the "Mooney" corner was the northeast corner of the township, and that the land in controversy was the southeast quarter of section four thereof: that the east line of the township was run north five degrees west instead of running due north, by the government surveyors, in locating said corner.

2.  Same—Location of Lines—Monuments and Marks—Best Evidence—Initial Point of Survey.

In determining conflicting claims as to what is a particular quarter section in a township, resort must be had, first, to the monuments placed at the various corners when the original government survey was made, provided they are still in existence, or can be relocated by the aid of any attainable data; but if this cannot be done, and a survey becomes necessary, it must be made from the east, and not from the west, boundary line of the township.

3.  Same—Resurvey to Locate Lines—County Surveyor—Statute—Controlling Monuments.

Under Pol. Code, Sec. 916, making county surveyor's survey presumptively correct, and 921, requiring county surveyor, in making a resurvey, to take care to observe and follow boundaries and monuments as run and marked by original survey, held, that a resurvey made by him with no attempt to observe the original monuments was not controlling, in an action to determine the identity of the land.

4.  Same—Error in Survey—Apportionment of Shortage—"Lost" corner—Evidence.

In order to justify an apportionment of a shortage of land within the boundary lines of a township, equally to each of the six sections along the line, the section lines and corners must either never have been marked at all, or have become so completely lost that they cannot be retraced or replaced by aid of any known or recognized natural object or permanent monuments; and to be "lost," when applied to section or township corners, means more than that they have been merely obliterated, tampered with, or changed, but they must be so completely lost that they cannot be replaced by reference to any existing data or other sources of information.

5.  Same—Erroneous Original Survey—Question For Determination—Province of Court.

In determining the identity of land within a township, where the original survey was concededly erroneous, the question to be decided is, the location of the actually established government corners; and it is not the province of the court to rectify errors in such surveys.

6.  Trial—Survey of Land—View and Inspection by Court—Judicial Discretion.

In a trial to the court, the trial judge has the inherent power, in his sound discretion, in absence of a statute, to make a personal inspection of a land survey, but this is only when it appears to be necessary to a clear understanding or application of the evidence; therefore, held, that, the evidence concerning the identity of a quarter section of land under a

certain description being so positive on both sides, and so conflicting, that it was difficult, without making an inspection of the premises, or having the witnesses for one side or the other impeached, to determine where the truth lay, such inspection was justified.

7. **Real Property—Title—Erroneous Boundary Lines—Patent By Mistake—Adverse Possession, Rights Thereunder—Limitations.**

Where, for over twenty years prior to commencement of suit, plaintiff and his grantors had been in undisputed possession of the land in controversy, claiming the same by a certain description, first as an entryman under the federal timber culture act, and afterwards under a patent, during all of which time improvements were made, believing in good faith that they were owners, held, that defendant should not be heard to claim the land, notwithstanding that, through some mistake of government officials or survey, there was issued to his grantor a patent to the tract, to which such grantor had no right.

(Opinion filed March 21, 1914.)

Appeal from Circuit Court, Aurora County. Hon. FRANK B. SMITH, Judge.

Action by Dean Mason and others against Fred Braught, to determine the identity of a quarter section of land. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

*Spangler & Haney,* for Appellants.

In cases of this character, if the corners and lines established by the Government survey can be identified they must control, regardless of whether they are right or wrong. And evidence that trees and fences in an early day were located according to the Government survey has a strong tendency to establish it even if all the Government corners cannot be found. Arneson v. Spawn, 2 S. D. 269; Radford v. Johnson, 77 N. W. 601; Randall v. Burk Township, 4 S. D. 337; Hanson v. Red Rock Township 4 S. W. 373; White v. Anchien, 14 S. D. 270.

A subsequent survey made by a County Surveyor is not conclusive, it is only presumptively correct. Webster v. White, 8 S. D. 489.

Where many of the Government corners are identified, and others have become obliterated, and the former location is shown by fences, trees, roads, etc., the obliterated corners can

easily be located by measurements from the known corners. And hence such obliterated corners are not lost. Wentzel v. Claussen, 127 N. W. 621 (S. D.); 2 Ency. Ev. 693-Title "Boundaries."

A Court or Judge may not view that which is in dispute, or make such personal observations as were made in this case; such observations are incompetent as evidence.

Statutes allowing a view by the Jury are to be strictly construed—its a mute view—no conversation—no evidence to be taken—no one to be present but Jury and person appointed by Court to escort them. Code Cr. Pro. S. D. Sec. 37; People v. Green, 53 Cal. 60; Hayward v. Knapp, 22 Minn. 5; Peppercorn v. Black River Falls, 89 Wis. 38; Stampofski v. Steffens, 79 Ill. 303; Winslow v. Morrill, 68 Me. 362; Helme v. Kingston, 8 Kulp 221.

An unauthorized view is ground for new trial. State v. Perry, 121 N. C. 533; People v. Tyrrell, 3 N. Y. Cr. Rep. 142; Woodbury v. Anoka, 52 Minn. 329.

And the same rule applies in civil actions. Harrington v. Worcester, Ry. Co. 157 Mass. 579; Bowler v. Washington, 62 Me. 302; Deacon v. Shreve, 22 N. J. L. 176; People v. Hope, 62 Cal. 291; Hayes v. Territory, 54 Pac. 300.

Knowledge gained by a view cannot be made the basis of a decree. McCamman v. Davis, 127 N. W. 328; McCamman v. Davis, 162 Mich. 435; McCamman v. Davis, 17 Detroit Leg. N. 604; Morrison v. Railway Co., 51 N. W. 75; Brady v. Shirley, 14 S. D. 447; Grantz v. Deadwood, 20 S. D. 495.

The Court was in error in commencing at the "Mooney" corner and by metes and bounds describing the Southwest Quarter of said Section Four and holding it to be the Southeast Quarter which plaintiffs claim to own.

If there is, actually, a shortage on the north line of said Township such shortage should be proportioned clear through the entire distance of said line, and the adjustment of such shortage should not be made by putting an entire quarter section out of existence. Rules Gen. Land Office, Sections 79-86 Inclusive.

The evidence is insufficient to establish said "Mooney" cor-

ner as the original Government corner placed at the northeast corner of said Eureka Township.

The "Mooney" corner is not the northeast corner of Eureka Township, but such corner is one-half mile east of the "Mooney" corner, and that corner is a half section corner, as placed and marked by the Government in the original survey.

It is admitted by all parties that the corner established or identified at the southeast corner of Eureka Township is the true original Government corner of that Township, and the northeast corner is required to be located in a due line north from this known corner, which would place the northeast corner one-half mile east of the "Mooney" corner—this is inconsistent with plaintiff's evidence. Arnson v. Spawn, 2 S. D. 269.

Every fact, and every circumstance, proven by the evidence on either side of this case is inconsistent with the location of the northeast corner of Eureka Township at that point which is now designated as the "Mooney" corner.

*Fellows & Fellows,* for Respondents.

Section 258, Code Civ. Proc. provides that "when in the opinion of the Court, it is proper for the jury to have a view of the property which is the subject of litigation or the place in which any material fact occurs" it may order the jury to make a view. Clayton v. Chicago I. & D. R., Co., 67 Iowa 238; 25 N. W. 150.

The ordering of a view is descretionary, and an appellate court will not interfere with the exercise of such discretion in the absence of a showing of abuse. People v. White, 116 Cal. 17; Pick v. Rubicon Hydraulic Co., 27 Wis. 433; Snow v. Boston M. R. Co., 65 Maine 230.

Since a jury might have been sent out to view the premises, the Judge, who is performing the functions of both court and jury, may make personal observation. It is an every day practice for judges to view exhibits and rely on their observations in making decisions; as in cases involving documents, handwriting, etc. Morse v. Blanchard, (Mich.) 75 N. W., page 93; People v. Milner, (Cal.) 54 Pac. 833.

A view by the court acting without a jury is independent evidence which may be considered in making up the decision. Hatton v. Gregg, (Cal.) 88 Pac. 592; Preston v. Culberson,

58 Cal. 198, 210; London Gen. O. Co. v. Lavell (1901), 1 Ch. 135, 70 L. J. Ch. 17; Kremer v. Rudolph 105 Wis., 534, 81 N. W. 654; Weiant v. Rockland Lake T. R. Co., 70 N. Y. Supp. 713.

The fallacy of the proposition to divide proportionately a township in which numerous government monuments exist is readily apparent. According to the contentions of both parties it would be impossible to make any such proportionate division.

There is no showing that the preponderance of the evidence is against the Mooney corner as being the northeast corner of the township, and in the absence of such showing the court cannot disturb the finding.

POLLEY, J. This is an action brought to determine the identity of a quarter section of land in Eureka township, in Aurora county. Respondent claims it by virtue of his title to the southeast quarter of section 4, and appellant claiming it by virtue of his title to the southwest quarter of the same section. The difficulty grows out of an apparent error in the original survey of the township, and the solution of the difficulty depends upon the correct identification of the northeast corner of the township; respondent claiming the corner to be at one particular point, while appellant claims it at another point approximately half a mile farther east. The southeast, southwest, and northwest corners of the township are all fixed points and recognized by both parties to be correctly located. If the point claimed by appellant as the northeast corner is the true corner then the township is six miles square and contains 36 full sections, and respondent's land is a half mile east of the land he is claiming; while if the point claimed by respondent is the true corner then the township is only 5½ miles long on the north side, and there is a considerable shortage in the acreage in the township as a whole.

[1] The land in controversy was located as a tree claim, by one Eastman, in February, 1882, as the southeast quarter of section 4. He built a house just across the line in section 3 and resided there a number of years; he ploughed a ten acre tract in the northeast corner of the tree claim and planted it to trees. In 1883 a schoolhouse was built at the southwest corner. Subsequently the title to the land as the southeast quarter of section 4

passed to respondent. The grove of trees, the Eastman house, and the foundation of the schoolhouse are all there yet, so there is no question about the situs of the land claimed by respondent. The premises were inclosed, occupied, and used continuously by Eastman and his successors in interest, including respondent, without molestation or adverse claim, for more than 25 years. About 1909 appellant asserted his claim to the land as the southwest quarter of section 4, ousted respondent, and took forcible possession thereof.

[2] That something was wrong with the survey of the township was discovered as long ago as 1888, or earlier. Parties having title to land along the west side of the township undertook to take possession of the quantity of land called for by their patents. This resulted in conflicting claims to the same land, but they claimed they had the right to measure off their full amount of acreage using the west boundary line of the township as a base from which to make their measurements. This, of course, in the first instance at least, was not the correct method of determining such conflicts. Resort should be had, first, to the monuments placed at various corners when the original government survey of the land was made, provided they are still in existence and can be identified, or can be relocated by the aid of any attainable data. But if this cannot be done and the resurvey becomes necessary, this must be made from the east, and not from the west, boundary line of the township. The evidence shows that the boundary line of the township had been surveyed and marked in 1869, and that the interior lines of the township had been surveyed in 1873. It is also clear that monuments consisting of stakes, mounds, and pits' had been placed at some, if not all of the section corners and quarte. corners according to the government requirements in force at that time.

Eastman, who located the land in conflict in 1882, was present and testified at the trial. He testified that when he made the location he started from a point known as the "Mooney" corner for the northeast corner of the township, and from there run west three miles; that there he found what appeared to be a section corner, marked by a mound and four pits, and was the corner of sections 3 and 4 on the township line. From there he ran south a mile, where he found a corner marked by a mound, in which there stood a stake, and four pits; that this was the southwest corner of

section 3 and the southeast corner of section 4; that half way be-, tween these two points he found a point marked by a mound and two pits. From the southeast corner of section 4 he ran west half a mile, where he found a mound and two pits. This he took for the south quarter corner of section 4 and used as the southwest corner of his tree claim. This testimony relative to these various monuments was abundantly corroborated by the testimony of other witnesses who were there at and about the same time. One of these witnesses was a civil engineer and surveyor of 40 years' experience. He had had large experience as a government surveyor, and as early as 1884, retraced the same lines as testified to by Eastman and found them to be marked substantially as Eastman found them. It is true that other witnesses testified to a different satte of affairs, but they testified mostly to conditions at a subsequent time; and it appears, beyond a doubt, that different surveyors had worked over the ground and that attempts had been made to correct the supposed error that existed in the original government survey. And it is also a fact that at the present time some of the corners that were marked by a mound and two pits in 1884, are now marked by a mound and four pits, some of the corners that were marked by a mound and four pits in 1884 are now marked by a mound and two pits, and at least one corner (the southwest corner of the tree claim) is now marked by a mound and two pits, and, within a few rods of there, a mound and four pits. It also appeared that, at some of the corners, the different pits around the same mound were made at different times.

[3] An attempt was made by the county surveyor of the county to resurvey the township in 1889. The field notes of this survey are in the record, but they are of little or no value as evidence. They do not show an attempt to relocate the lines of the original survey and to relocate and re-establish the section corners and quarter corners as originally located by the government survey, but rather to establish new and different corners to conform to the surveyor's idea of a correct survey of the township. The corners established by him are not only marked by mounds and pits, but a stone is placed in the various mounds, and these stones are so marked as to indicate the particular corners they occupy; but upon what data he based his survey or what point on the township boundary he used as his initial point does not appear. While,

by the provisions of section 921, Pol. Code, his surveys are presumptively correct, section 926 requires him to: "Take care to observe and follow the boundaries and monuments as run and marked by the original survey." This he did not do, and, therefore, the monuments established by him cannot be allowed to control. White v. Amrhien, 14 S. D. 270, 85 N. W. 191; Arneson v. Spawn, 2 S. D. 269, 49 N. W. 1066, 39 Am. St. Rep. 783; Hanson v. Township of Rediock, 4 S. D. 358, 57 N. W. 11; Randall v. Burk Township, 4 S. D. 337, 57 N. W. 4; McGray v. Monarch Elevator Co., 16 S. D. 109, 91 N. W. 457.

But it is contended by appellant that the corner known as the "Mooney" corner is not the correct corner of the township, that the corner of the township should be at a point half a mile farther east than the "Mooney" corner ;and that, if such point were used, it would bring the southwest quarter of section 4 a half mile farther east, and that the land now claimed by respondent as the southeast quarter of 4 would take the place of what is now the southwest quarter of 3, and that the land claimed by appellant would become the southeast quarter of 4, and thus make room for them both. On this contention the evidence is overwhelmingly against appellant and in favor of the respondent. In the first place, it appears that as far back as 1882 the "Mooney" corner was recognized by the old settlers and people in the vicinity as the true northeast corner of the township. At that time it was plainly marked by a mound and four pits, and in the mound stood a stake bearing inscriptions indicating a township corner. Two of the pits (the one at the south and the one at the east of the mound) were still visible at the time of the trial. The other two have been worn away by the road. This corner was used as the initial point for surveying and locating a considerable portion of the land in the four adjoining townships. A measurement from there along the township line east to the east boundary line of Aurora county shows it to be approximately 12 miles—the width of two townships—and there are two full townships between Eureka township and the east line of the county. Again, there is a line running southerly from the "Mooney" corner that is regarded as the east boundary line of sections 1 and 12 in Eureka township, and along which are placed marks or monuments indicating the easterly corners and quarter corners of these two sec-

tions, and along which line there is also a well-defined traveled county road. It is also clear from the record that the land along this line in the township next east from Eureka is located relative to this same line. But it is claimed by appellant that the northeast corner of the township should be six miles due north of the southeast corner, while the "Mooney" corner is half mile west of what is conceded, by both parties, to be the southeast corner. This is true, and it is also true that the line above referred to, along the east side of sections 1 and 12, is not a true north and south line, but runs north approximately five degrees west. For the purpose of correctly establishing the northeast corner of the township, one of appellant's witnesses, a qualified civil engineer and surveyor, ran a line from the southeast corner of Eureka township due north until it intersected a line running due east from the "Mooney" corner, the north boundary line of the township. The point of intersection is approximately a half mile east from the "Mooney" corner, and this, it is claimed, is the correct corner of the township, and that distances along the north line of the township should be measured from this point rather than from the "Mooney" corner. It is a significant fact, however, that this witness, in running this line due north six miles long, did not find any section corners—though he said he made a search for them at points where he thought they ought to be—nor coincide with any section line, fence line, or roadways, but ran through the open fields all the way. In fact, he found himself obliged to make offsets at two different places in his line twice—once to avoid coming in contact with hay stacks and the other one to avoid a cornfield. Nor did he find anything to indicate a township corner or section corner when he reached the township line. It is also true that had he run this line north five degrees west to correspond with the course of the east boundary lines of sections 1 and 12 he would have intersected the north boundary line of the township at a point 42 chains west of the point where he did intersect it, which would have been almost exactly at the "Mooney" corner. From all of these facts, the conclusion is irresistible that when the easterly boundary line of Eureka township was located it was run north five degrees west instead of running due north, and that the "Mooney" corner is the point

that was actually located as the northeast corner of the township when the original survey was made.

[4] But it is contended by the appellant that, this being true, the north line of the township is only 5½ miles long, instead of 6 miles, and that the shortage should be apportioned equally to each of the six sections along the line. This may be done in a proper case, but it is only where the section line and corners were either never marked at all or where such lines and markings have become so completely *lost* that they cannot be retraced or replaced by the aid of any known or recognized natural object or permanent monuments. And to be *lost,* when applied to section or township corners, means more than that they have been merely *obliterated,* tampered with, or changed. They must be so completely lost that they cannot be replaced by reference to any existing data or other sources of information.

[5] The testimony on both sides is very voluminous and conflicting to the last degree, but we are satisfied that the findings of the trial court (that the "Mooney" corner is the northeast corner of Eureka township and that the land in controversy is the southeast quarter of section 4 in that township) are supported by a preponderance of the evidence. It may be conceded that the northeast corner of the township should originally have been placed at a point due north of the southeast corner, which would have been approximately half a mile east of the "Mooney" corner, and it may be conceded that the original survey was erroneous and irregular, but that is not the question to be decided by the court. The question to be decided is: Where, in fact, was the corner actually established? Arneson v. Spawn, supra. It is not the province of the court to rectify errors made by government surveyors in surveying the public lands.

[6] After all the evidence on both sides was in, but before the court's decision was rendered, the trial judge, without the consent of either party, but with knowledge of and without objection from either, went out and examined some of the corners and objects that were the subjects of some of the testimony. This is assigned as error, and appellant strenuously contends that he is entitled to a new trial for this act alone, claiming that there is no statute permitting such proceedure on the part of the judge, and that, without such statute, there is on authority

for it at all. The statute in civil actions (section 258, Code Civ. Pro.) and in criminal actions (Sec. 377 Code Cr. Pro.) authorizes the court, when he thinks it a proper case, to permit the jury to view the scene of certain transactions or certain objects that have been the subject of the testimony; but the statute nowhere makes provisions for the court himself to make such inspection. The cases cited by appellant on this point are mostly cases involving the conduct of jurors who have been allowed to make an inspection of premises or where they had taken it upon themselves to make an inspection without permission, and throw but little light on the subject. The rule is well established that jurors must decide cases upon the evidence produced at the trial and that they cannot go out in search of evidence or act upon evidence obtaied out of court. The inspection is only for the purpose of elucidating the evidence that has been admitted at the trial and not for the purpose of seeking new or additional evidence.

While there is no statute expressly authorizing the court to make an inspection, neither is there any statute prohibiting it; and it appears to be generally conceded that the court has the inherent power to make such inspection when he deems it necessary in order to understand or properly apply the evidence introduced at the trial. Bitello v. Lipson, 80 Conn. 497, 69 Atl. 21, 16 L. R. A. (N. S.) 193, 125 Am. St. Rep. 126; Hatton v. Gregg, 4 Cal. App. 537, 88 Pac. 592; McCamman v. Davis, 162 Mich. 435, 127 N. W. 329; First Nat'l Bank v. Clifton A. Co., 14 Ariz. 360, 128 Pac. 810; London G. O. Co. v. Lavell, 1 Ch. Div. 135; Kremer v. Thwarts, 105 Wis. 534, 81 N. W. 654; Weiant v. Rockland L. T. R. Co., 61 App. Div. 383, 70 N. Y. Supp. 713. It is a power, however, that is vested in the sound discretion of the trial judge, and is to be exercised only when it appears to be necessary to a clear understan ling or application of the evidence.

With these observations in view, let us examine the conduct of the court that is complained of by the appellant:

Certain witnesses for the plaintiff testified that as far back as in February, 1882, the southeast corner of the tree claim, which plaintiff claims to be the southeast corner of section 4, was marked by a mound and four pits; and that later there

was a north and south road at that point. The same witnesses also testified that at the same time there was a mound and two pits at the southwest corner of the tree claim, which plaintiff claims was the south quarter corner of section 4, and that this mound and pits were about three or four rods southwesterly from the old schoolhouse foundation, and that there was no north and south road at that place. On the other hand, the witnesses for the defendant testified, just as positively, that at the present time the southeast corner of the tree claim is marked by a mound and two pits, and that there is no north and south road at that point; while at the southwest corner of the tree claim there is a mound and four pits, about five or six rods southeast of the old schoolhouse foundation, and that there is a north and south road at that point. The court by his examination simply attempted to find which side was correctly stating the facts, and he says, in his decision, that upon examining the southeast corner of the tree claim, he did find a mound and two pits, but that the same looked altogether too plain to have withstood the action of the elements for 37 years, or, in other words, looked "suspicious," but that he also found the evidence of a mound and ofur pits, just as had been described by the witness Eastman, and that there had been at that point, in the past, a well-marked north and south road. He also said that at the southwest corner of the tree claim he found a mound and four pits, showing very plainly, just as claimed by the defendant, but that he also found at a point about three or four rods southwest of the old schoolhouse foundation what appeared to have been a mound and two pits, as described by the witness Eastman, and that there was no north and south road at that point. Upon this contention, the court adopted plaintiff's version of the facts and found eccordingly. We do not believe that the trial court abused his descretion in making the examination he did. The evidence was so positive on both sides an so conflicting that it was difficult, without having made an inspection of the premises or having the witnesses for one side or the other impeached, to determine where the truth lay.

It does not appear that the court took any additional testimony while absent making the inspection or that he examined any lines or monuments other than those that had been the sub-

ject of testimony taken in court, nor that any matter was considered that is not in the record for review by this court. He appears to have been of the opinion that an examination of those objects would enable him to better understand and apply the testimony. Had these various objects been of such a nature that they could have been brought into court it would have been incumbent upon the parties to the action to have introduced them in evidence. It would then have been the duty of the court to have examined them as minutely as the nature of the case would permit. This is a matter of almost daily occurrence in the trial of causes in courts of justice, and no good reason has been shown why a trial judge may not, in a proper case, go outside of a courtroom and view an object that from its nature will not admit of its being brought into court.

[7] In addition to what has already been said, there is a further reason why the respondents ought to recover in this action: The land in dispute was originally settled upon by the said Eastman. He believing it to be the southeast quarter of section 4 filed upon it under that description, and improved it by breaking a portion of it and planting a grove of trees thereon. He afterwards relinquished it to the government, and the plaintiff's grantor entered it under the timber culture act, believing it to be the southeast quarter of section 4. He made further improvements thereon and finally, having complied with the federal statutes relative to tree claims, made his final proof and received his patent from the government. The patent described the land as the southeast quarter of section 4, and it was believed by the federal officers, as well as the patentee and all other parties concerned, that this identical piece of ground was the southeast quarter of section 4. Defendant's grantor entered the quarter section of land lying just to the west of the one in dispute, believing it to be the southwest quarter of section 4. By occupying and improving the same he complied with the federal statutes and afterwards received a patent for the same, describing it as the southwest quarter of section 4. The land occupied by him in nowise conflicted with the land occupied by plaintiff's predecessor in interest, but each received his patent properly describing, as he believed, the land that he was occupying and to which he was entitled; and the undisputed evi-

dence shows that the defendant's grantor never supposed he had filed upon land claimed by the plaintiff or that he was entitled to a patent thereto; and the evidence shows that all of these facts were well known to the defendant. The evidence shows that, while defendant is now claiming the land formerly in the possession of the patentee of the southwest quarter of section 4, he claims to hold such possession by virtue of title that he has acquired to the southeast quarter of section 5. Yet it clearly appears from the evidence that he has been claiming, and still retains, possession of that tract of land which would be the southeast quarter of section 5, provided the tract of land in dispute is the southeast quarter of section 4. The evidence shows that in 1891 the defendant's grantor took the patent to the southwest quarter of section 4 and that it was under such patent that he held the tract of land adjoining the tract in dispute on the west, and that he held the same under such patent for some 12 years, until he sold that tract to the defendant; and there is no evidence to show, and there is no claim made by the defendant, that, when he purchased the southwest quarter of section 4, he believed he was buying the tract of land that had been patented to plaintiff's grantor as the southeast quarter of section 4. It is undisputed that for more than 20 years prior to the commencement of this action plaintiff and his grantors had been in the undisputed possession of the tract of land in question, claiming the same, first, as entrymen under the timber culture act of the United States, and afterwards under patent issued by the government. During all of such time they had been making improvements thereon, believing in good faith that they were the owners of the premises so occupied. At this late date and under the circumstances disclosed by the record in this case, the defendant should not be heard to claim that he, or his grantor, ever acquired any title to or interest in the tract of land in controversy, and this, too, regardless of whether or not through some mistake of the government officials or government surveyor there was issued to his grantor a patent to this tract of land when his grantor had no right to the same.

Other assignments made by the appellant have received our attention, but we fail to find where the court committed

error.   We believe the court's findings are fully sustained by the evidence, and the judgment and order appealed from are affirmed.