**UNITED STATES of America, Plaintiff,**

**v.**

**John and Florence CITKO, Defendants.**

**No. 77–C–292.**

United States District Court,
E. D. Wisconsin.

June 10, 1981.

Barbara B. Berman, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

Charles H. Barr, Menomonee Falls, Wis., for defendants.

MEMORANDUM AND ORDER

WARREN, District Judge.

In this civil action, plaintiff United States of America ("Government") seeks quiet title to several acres of land located in Forest County, Wisconsin. The Government is the owner of numerous parcels of land in Forest County. Defendants John and Florence D. Citko ("Citkos") own land adjacent to one of the Government's parcels of land. The dispute between the parties is over the location of the quarter corner which marks the boundary between their adjoining parcels of land. A four-day court trial was commenced on January 19, 1981. This memorandum and order constitutes the Court's findings of fact and conclusions of law.

### I. *Background*

The locations of the land owned by the parties is not in dispute. The Government is the owner in fee and is entitled to full possession of the following parcel of land:

The Southeast Quarter of the Southwest Quarter (SE ¼) of Section 24, Township 37 North, Range 15 East, in the County of Forest, State of Wisconsin, containing 40 acres, more or less, acquired by deed dated March 15, 1935, from Goodman Lumber Co., as U.S. Tract 740–B, recorded in the Office of the Register of Deeds for Forest County, Wisconsin, on March 27, 1935, in Volume 59 of Deeds, page 649.

The Southeast Quarter (SE ¼) of Section 24, Township 37 North, Range 15 East, in the County of Forest, State of Wisconsin, containing 160 acres, more or less, acquired by deed dated November 8, 1935, from Curtis-Jones-Sell Land Co., as U.S. Tract 15–C, recorded in the office of the Register of Deeds for Forest County, Wisconsin on November 16, 1935, in Volume 62 of Deeds, page 337.

The East Half of the Northwest Quarter (E ½ NW ¼) of Section 25, Township 37 North, Range 15 East, in the County of Forest, State of Wisconsin, containing 80 acres, more or less, acquired by deed dated December 2, 1936, from D. C. Hess, as U.S. Tract 870, recorded in the Office of the Register of Deeds for Forest County, Wisconsin, on December 2, 1936, in Volume 64 of Deeds, page 53.

The Citkos are joint owners in fee and are entitled to full possession of the following parcel of land:

The Southwest Quarter of the Northeast Quarter (SW ¼ NE ¼) of Section 25, Township 37 North, Range 15 East, in the County of Forest, State of Wisconsin.

The Northwest Quarter of the Northeast Quarter (NW ¼ NE ¼) of Section 25, Township 37 North, Range 15 East, in the County of Forest, State of Wisconsin.

The Citkos acquired their land on August 15, 1959 from Helen and George Kline.

The dispute here concerns the boundary between the western edge of the Government's land and the eastern edge of the Citkos' land. Specifically, the dispute is over the correct location of the quarter corner on the north line of Section 25, Township 37 North, Range 15 East, Forest County, Wisconsin.

In their joint final pretrial report, the parties set out the issue to be decided by the Court:

Whether the evidence of the original location of the quarter corner on the north line of Section 25, Township 37 North, Range 15 East, Forest County, Wisconsin, is insufficient to determine the location of said original quarter corner, thereby justifying restoring and reestablishing the position of said quarter-corner by means of proportionate measurement between section corners as located from original evidence. (Joint final pretrial report, p. 2)

The Government contends that the location of the original quarter corner is lost. The Citkos maintain that the original quarter corner is not lost. They argue that witnesses' statements, the location of a rock mound, the location of a fence, and several pieces of documentary evidence can be used to establish its location.

### II. *Applicable Law*

The guiding legal principles for locating and establishing quarter corners are not in

dispute. Title 43 U.S.C. § 752 provides, in relevant part:

> The boundaries and contents of the several sections, half-sections, and quarter-sections of the public lands shall be ascertained in conformity with the following principles:
>
> First. All the corners marked in the surveys, returned by the surveyor-general, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate;
> . . .
> Second. The boundary-lines, actually run and marked in the surveys returned by the surveyor-general, shall be established as the proper boundary-lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. * * *

■ Other than this statute, federal law sets forth no rules which help resolve this dispute. Where there is no controlling federal legislation or rule of law, questions involving ownership of land are determined under state law, even where the government is a party. *United States v. Doyle*, 468 F.2d 633, 636 (10th Cir. 1972), *citing Mason v. United States*, 260 U.S. 545, 558, 43 S.Ct. 200, 203, 67 L.Ed. 396 (1923). Therefore, the Court must turn to Wisconsin law.

■ Wisconsin law provides that resurveys of public lands must follow the rules established by the federal government. Section 59.62, Wis.Stats. (1979). The federal rules to be followed are contained in the *Manual of Instructions for the Survey of the Public Lands of the United States* (1973) (*"Manual"*). *See* Wisc. Atty. Gen. opinion, August 29, 1977. *See also Doyle*, 468 F.2d at 636–637 n. 4. The *Manual* has been supplemented by a pamphlet entitled, *Restoration of Lost or Obliterated Corners and Subdivision of Sections* (1974 edition) (*"Restoration"*). Both the *Manual* and *Restoration* were published by the United States Department of the Interior, Bureau of Land Management.

■ The original government rectangular surveys referred to in 43 U.S.C. § 752, platted public lands into townships, each comprised of 36 sections. Section corners, and quarter-section corners between section corners, were located and monumented. These original corners of townships, sections, and quarter-sections must stand as the true corners whether in the place shown by the field notes from the original survey or not. *Restoration, supra*, at 6.

■ The original survey as it was actually run on the ground controls. *United States v. State Investment Co.*, 264 U.S. 206, 212, 44 S.Ct. 289, 290, 68 L.Ed. 639 (1924), *cited in Doyle*, 468 F.2d at 636. It does not matter that the boundary was incorrect as originally established. That the inaccuracy of an original survey will set awry the shapes of sections and subdivisions does not affect the conclusiveness of the survey. *Doyle, Id.* at 636.

■ A corner is either existent, obliterated or lost. The different classifications are defined in the *Restoration* as follows:

> An existent corner is one whose position can be identified by verifying the evidence of the monument, or its accessories, by reference to the description that is contained in the field notes, or where the point can be located by an acceptable supplemental survey record, some physical evidence, or testimony. *Restoration*, at 9.
>
> An obliterated corner is one at whose point there are no remaining traces of the monument, or its accessories, but whose location has been perpetuated, or the point for which may be recovered beyond reasonable doubt, by the acts and testimony of the interested landowners, competent surveyors, or other qualified local authorities, or witnesses, or by some acceptable record evidence. *Id.* at 9.
>
> A position based upon collateral evidence should be duly supported, generally through proper relation to known corners, and agreement with the field notes regarding distances to natural objects, stream crossings, line trees, and off-line tree blazes, etc., or unquestionable testimony. *Id.* at 9–10.

A lost corner is a point of a survey whose position cannot be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position, and whose location can be restored only by reference to one or more interdependent corners. *Id.* at 10.

For a corner to be lost it "must be so completely lost that [it] cannot be replaced by reference to any existing data or other sources of information." *Doyle,* 468 F.2d at 637, *citing Mason v. Braught,* 33 S.D. 559, 146 N.W. 687, 689–690 (1914). The decision that a corner is lost should not be made until every means has been exercised that might aid in identifying its true original position. *Restoration, supra,* at 10. Even though the physical evidence of a corner may have entirely disappeared, a corner cannot be regarded as lost if its position can be recovered through the testimony of one or more witnesses who have a dependable knowledge of the original location. *Manual, supra,* Sec. 5–5. *See also Clark, supra,* § 281.

There is no clearly defined rule for the acceptance or non-acceptance of the testimony of individuals. It may be based upon unaided memory over a long period or upon definite notes and private marks. The witness may have come by his knowledge casually, or he may have had a specific reason for remembering. Corroborative evidence becomes necessary in direct proportion to the uncertainty of the statements advanced. *Manual, supra,* § 5–11.

### III. *Review of the Evidence*

At trial, the Government presented three live witnesses and one deposition witness. The Citkos presented three live witnesses and three deposition witnesses. The Court received twenty-two exhibits by stipulation. Before making its findings of fact, the Court will review the testimony of the witnesses and the most relevant exhibits.

### A. The Government's Case.

The Government's primary witness at trial was Gene Resvick, the United States Forest Service land surveyor who determined the claimed quarter corner was not the original quarter corner. Mr. Resvick gave a detailed explanation of the steps he took in searching for the original quarter corner. He stated he began his search by consulting the original field notes for the location of the disputed quarter-corner. Using those field notes, he and two assistants set out to find the two tamarack trees which the notes indicated marked the corner. They were unable, however, to locate the tamarack trees or any other signs of a corner at the location described by the original field notes.

In searching for the original quarter corner, Mr. Resvick and his assistants traveled to the site of the claimed quarter corner. There, Mr. Resvick found a rock pile and fence post just east of an old tramway. The rock pile, according to Mr. Resvick, was five to six feet long, three to four feet wide and 20 inches high. Despite having previously observed rock cairns, Mr. Resvick did not consider this rock pile to be a cairn.

Although the original field notes did not indicate that the original quarter corner was in the area of the claimed quarter corner, Mr. Resvick and his assistants spent over forty hours in that area searching for the tamarack trees which marked the original corner. During that search, Mr. Resvick found no evidence supporting the Citkos' claim. He found no discoloration of soil or depressions in that area. Nor did he find any stump evidence or other evidence of tamarack root patterns.

The lack of any physical evidence supporting the Citkos' claim was instrumental in Mr. Resvick's ultimate decision. Another instrumental factor was the location of a north-south fence on the sixteenth section line between the Citkos' property and their neighbor to the east. That line, which was set by a private surveyor in 1941, is midway between the northeast section corner and the spot where Mr. Resvick set the new quarter corner by single proportionate measurement.

Mr. Resvick's rejection of the Citko corner was based to a great extent on the lack of physical evidence at the claimed quarter corner and the location of the fence along the sixteenth section line. However, he also relied on maps, plats and other documentary evidence. The Government placed many of the documents into evidence at trial. Two of those documents merit discussion.

Exhibit BB consisted of a packet of notes taken by Civilian Conservation Corps workers in 1934 while they were locating section corners and quarter section corners. Each slip in the packet described a worker's summary of his search for a particular section corner or quarter section corner. The slips were designed so as to allow the person searching for the corner to state what the corner consisted of, its condition, its dimensions above ground, and the markings and location of bearing trees. The slips also asked whether the searcher believed the corner to be a genuine Land Office Corner. On the back of each slip, the searcher was to describe the location and distance to the corner from a metal location poster placed to mark his work.

L. M. Gibson, the junior forester who filled out the slip for the quarter corner in question, did not state the condition, dimension or type of marker used to mark the corner. Yet, according to his slip, he located a genuine Land Office quarter corner which checked with the southeast corner of section 24. Mr. Gibson placed his metal location poster on a lone spruce tree on the west side of an old railroad grade. He did not state how far the metal location poster was from the corner, although he did state that distance on every other slip he filled out. Because Mr. Gibson did not identify a section corner marker or the distance from the corner to his metal location poster, Mr. Resvick concluded Mr. Gibson did not actually locate the original corner.

Another piece of evidence Mr. Resvick relied upon in making his decision was exhibit M, a plat of traverse used in the construction of highway 2159, the highway which lies 75 feet west of the claimed quarter corner. The map, which apparently was made in 1935, describes the area surrounding highway 2159. It shows a unverified quarter corner just east of the highway. It also states distances from the northern section corners "to tie." (According to the witnesses at trial, the phrase "to tie" could denote the distance to a tree, a rock, a road, another corner or some other identifiable object.) The distance listed on the traverse from the northeast corner to tie was 2837 feet. The distance listed from the northwest corner to tie was 2510 feet. Because the plat showed the quarter corner to be unverified, Mr. Resvick understood "to tie" to mean the distances between the section corners and highway 2159, and not the distances from the section corners to the claimed quarter corner or some other marker.

During his testimony, Mr. Resvick mentioned three considerations upon which he based his decision. First, Mr. Resvick believed the original quarter corner had been placed on the line between the section corners rather than 44 feet north of that line at the claimed quarter corner, because the distance between the located section corners was only 6.8 feet more than the distance listed in the original field notes. Second, Mr. Resvick concluded that the parties who drew up the map were unable to locate the corner because the road survey (exhibit M) indicated the section corners had been verified but the quarter corner had not. Third, Mr. Resvick concluded the claimed quarter corner was not used to determine the sixteenth corner because the fence running south from the sixteenth section corner was not midway between the claimed quarter corner and the northeast section corner.

The Government's second witness was Thomas Arnott, a surveyor hired by the Citkos in 1971 to help them convince the Government that the claimed quarter corner was the original quarter corner. Mr. Arnott's service for the Citkos was short-lived apparently either because he did not agree with their position or because he was not paid. Mr. Arnott testified he searched the area around the claimed quarter corner

and found no evidence of tamarack stumps or evidence that tamarack trees ever grew there. He also testified he attempted to locate the original quarter corner by using exhibit I, a 1935 right-of-way deed involving a strip of land along highway 2159. The right-of-way deed describes the measurements used to reach the quarter corner in question from U.S. Highway 8. Mr. Arnott followed the measurements and directions and, instead of arriving at the claimed quarter, reached a point 160 feet east of the claimed quarter corner—a point exactly 100 feet north of the quarter corner set by Mr. Resvick. Having failed to find physical evidence to support the Citkos' position, and having failed to reach the claimed quarter corner by following the measurements on exhibit I, Mr. Arnott concluded there was insufficient evidence to establish the claimed quarter corner as the original quarter corner.

The Government's final witness was Victor Hedman, the Regional Land Surveyor for the United States Forest Service. Because Mr. Hedman was not involved in Mr. Resvick's field work, he could not testify as to Mr. Resvick's surveying techniques or conclusions regarding the claimed quarter corner. Consequently, his testimony is of no value in helping the Court determine whether the claimed quarter corner is the true corner.

The Government also submitted into evidence the deposition of Webster Intermill, the district ranger who supervised Mr. Gibson and the other civilian conservation corps workers who compiled the slips which constitute Exhibit BB. Mr. Intermill also supervised the construction of Highway 2159. The Court has reviewed his testimony and has found nothing in it to refute or support either party's position.

B. The Citkos' Case.

As their first witness, the Citkos presented Arthur Kadubek, a neighbor of the Citkos who has lived in that area of Wisconsin his entire life. Mr. Kadubek testified he first saw the rock pile at the claimed quarter corner in the early 1960's. In addition, he said there is a fence which runs easterly from highway 2159 past the claimed quarter corner to the sixteenth section corner. Finally, he testified there is an understanding in the community that fences are used as boundary lines and corners are set by stone.

John Citko was the next witness. He testified that he purchased his land in 1959. He said that the first time he saw the rock mound at the claimed quarter corner was when Mr. Resvick took him there to search for the quarter corner. In addition, he stated that the rocks which form the rock pile at the claimed quarter corner do not resemble the other rocks on his farm.

During his testimony, Mr. Citko also discussed the timing of his disclosure to Resvick of his witnesses. He said that during their first trip to the rock mound he did not tell Mr. Resvick he had witnesses and Mr. Resvick did not ask him if he had any witnesses. Mr. Citko said he first learned John Nuskiewicz would speak as a witness for him in 1968. He learned Frank Kowalkowski would be willing to speak as a witness prior to 1974. Although Mr. Citko knew both these men could speak as witnesses for him prior to 1974, he did not relate their names to Mr. Resvick until after he commenced this action in 1977.

The Citkos' final live witness was Norman Harrison, a land surveyor who also searched the area of the claimed quarter corner for evidence supporting the Citkos' position. Mr. Harrison testified he did some digging at the site of the claimed quarter corner and found some soil discoloration which could have resulted from disintegration of a wood post. It was his opinion that the rock pile had not been dumped at the claimed quarter corner site but had been constructed there. He also stated the rock mound did not resemble a second rock dump which was located one hundred feet south of the claimed corner. Based on his search and the statements of defendants' witnesses, he concluded the claimed quarter corner is the original quarter corner.

On cross-examination, Mr. Harrison admitted he had never looked for root systems

at the locations where the bearing trees allegedly had stood. He also stated he never measured the distance between the fence and the section corners. Finally, he stated that his opinion that the claimed corner site was the true corner was based largely on the living witnesses' testimony. He said his opinion would be affected if their statements were found to be questionable.

The Citkos also introduced the deposition testimony of three individuals into evidence. Their first deposition witness was Joseph Cichonski, the owner of the farm to the east of their farm. He testified that, to the best of his recollection, the fence that runs over the claimed corner to Highway 2159 was constructed in 1937. He also said that the fence along the border between his property and the defendants' property was built in 1941 or 1942 after a local surveyor had determined the location of the sixteenth corner. The fence replaced a fence erected in 1931 or 1932. According to Mr. Cichonski, the 1931 fence was located approximately thirty feet to the west of the 1941 fence. Mr. Cichonski also testified that the United States Forest Service set a sixteenth corner at a location south of the sixteenth quarter corner set by a private surveyor.

John A. Nuszkiewicz, the Citkos' second deposition witness, owns a farm one-half mile from the Citko farm. He testified he has been on the land in dispute many times since 1930. He said he first saw a post at the claimed quarter corner while walking down the tote road in 1930 and assumed it was a corner post. Although he thought it was a corner post, Mr. Nuskiewicz could not testify that the post was located at the exact site of the claimed quarter corner.

The Citkos' final witness, Frank Kowalkowski, gave deposition testimony twice. His first deposition took place on November 8, 1979; his second deposition took place on July 11, 1980.

In his first deposition, Mr. Kowalkowski, who is also a neighbor of the Citkos, testified he first saw two posts at the site of the claimed quarter corner in the 1930's. In addition, he said he saw rocks piled in a ring

at the claimed quarter corner in 1931 or 1932.

In his second deposition, Mr. Kowalkowski went into great detail describing the events which kept his memories of the claimed quarter corner fresh in his mind. He discussed in vivid detail a deer hunting incident which occurred in November of 1927. Mr. Kowalkowski was thirteen years old at the time and was hunting with his older brother. His brother shot the deer and wounded it. The brothers did not bag the deer that day but returned the next day to get it. When they found the dead deer the next day, they put a rope around it and began to drag it south toward what is now the Citko farm. When they reached the tote road which lies just to the west of the claimed quarter corner the brothers rested. Mr. Kowalkowski testified that while resting he saw two corner posts about twelve feet away from him. He said that there was one tamarack tree north of the posts and a second tamarack tree south of the posts. He walked up to the trees and saw markings on them twelve to sixteen inches long. Both trees were dead. Mr. Kowalkowski also said one of the cedar posts was marked "24" on one side and "25" on the other.

In addition to recalling the quarter corner from the deer hunting incident, Mr. Kowalkowski stated he could recall the claimed quarter corner because he saw the post numerous times while walking along the tote road in 1927 and 1928. The last time Mr. Kowalkowski recalled seeing the post was in 1938 when he was planting trees for the United States Forest Service.

### IV. *The Court's Findings*

After carefully and thoroughly reviewing the testimony of all witnesses and after studying the exhibits in evidence, the Court finds that the claimed quarter corner is the quarter corner established in the original survey in 1865. Therefore, the Government's complaint will be dismissed.

The Court can find no fault with the physical search performed by Mr. Resvick. It was remarkably thorough and profession-

al in every aspect. Based on Mr. Resvick's physical search, the Court finds that the original quarter corner is no longer existent.

Neither the surveyor's nor the Court's inquiry ends, however, with the determination that the corner is no longer existent. It is still necessary to determine whether the corner is lost or merely obliterated. To make this determination, it is necessary to ascertain whether the location of the corner has been perpetuated by the acts and testimony of interested landowners, competent surveyors, or other qualified local authorities, or witnesses, or by some acceptable record evidence. *Restoration* at 9.

Relying upon the lack of physical evidence supporting the Citkos' position and certain documenting evidence, Mr. Resvick concluded the original corner was lost rather than merely obliterated. The Court will discuss the evidence Mr. Resvick relied upon and give its reasons for rejecting the conclusions he drew from that evidence.

The first factor relied upon by Mr. Resvick was the distance between the section corners. Because the distance between those corners (5326.5 feet) was less than 7 feet more than the distance stated in the original field notes (880.6 chains equals 5319.6 feet), Mr. Resvick believed that the original quarter corner was set somewhere along the line between the corners. The problem with his conclusion is that the distance between the northwest corner and the claimed quarter corner, when added to the distance between the northeast corner and the claimed quarter corner, is 5327 feet— only 8 inches more than the distance between the corners when measured along a straight line. Given the poor quality of surveying equipment in 1865, it is reasonable to conclude that the measurements from the section corner were to the claimed quarter corner.

The second factor relied upon by Mr. Resvick was the road survey. Because the road survey did not show that the quarter corner had been verified, Mr. Resvick assumed that the distances listed on the map "to tie" were distances from the section corner to Highway 2159. As the Citkos brought out at trial, however, the distances "to tie" were very close to the distances from the established section corners to the claimed quarter corner. (Northwest to tie —2510 feet, northwest to claimed corner— 2508.5 feet. Northeast to tie—2837 feet; northeast to claimed corner—2818.5 feet.) Thus, rather than refuting the Citkos' argument, the road map offers support to the Citkos' argument that the claimed quarter corner is the true quarter corner.

The third factor Mr. Resvick relied upon was the location of the north-south fence between the Citko property and the Cichonski property. The location of that fence is exactly midway between the northeast section corner and the quarter corner as established by Mr. Resvick. It was Mr. Resvick's position that the fence would not have been exactly midway between the two points had the claimed quarter corner been the true quarter corner. There are two problems with that reasoning. First, up until 1941, the fence was, in fact, further west. Second, the surveyor who set the location of the fence worked only from the eastern side of the section and did not utilize the quarter corner in controversy to set that line. Thus, the location of the fence cannot be used to defeat Citkos' arguments.

Finally, Mr. Resvick relied upon the notes prepared by Mr. Gibson. Although it is clear from Mr. Gibson's notes that he only approximated the quarter corner location, it is also clear that the marker he used to set the quarter corner was *west* of an old railroad grade. Because the claimed quarter corner is east of the tramway, it cannot be said that Mr. Gibson was searching for the corner in the area of the claimed quarter corner.

Having rejected the evidence supporting Mr. Resvick's finding, the Court is left with only Mr. Arnott's trigonometric survey. Although that survey is supportive of the Government's position, in light of the evidence presented by the Citkos, it cannot by itself lead the Court to accept the Government's argument that the corner is lost.

Because the evidence relied upon by the Government does not support its conclusion that the original corner is lost, the Court finds that the Government has failed to carry its burden of showing by a preponderance of the evidence that it could not establish the location of the original quarter corner by reference to any existing data or other sources of information. Moreover, on the basis of the evidence put forth by the Citkos, the Court finds that the claimed quarter corner is, in fact, the original quarter corner.

The Citkos based their argument, in large .part, on deposition evidence. To an extent, this was unfair to the Government and, in particular, to Mr. Resvick because the Citkos did not disclose the identity of these witnesses until after they commenced this action—long after Mr. Resvick determined the corner was lost. However, Mr. Resvick's ignorance of the existence of Citkos' witnesses was partially due to his failure to ask the Citkos if they knew of any witnesses. As a professional surveyor, it was incumbent upon him to make a diligent effort to find witnesses before determining there were none, especially when dealing with people who probably did not know they could use witnesses to bolster their position.

Although the deposition testimony of Joseph Cichonski and John Nuszkiewicz and the first deposition of Frank Kowalkowski did little to bolster the Citkos' claim, the testimony of Frank Kowalkowski in his second deposition was very persuasive. His memory was much clearer than during his first deposition. Although this may, in part, have been due to reviewing his testimony with the Citkos' counsel prior to the deposition, the Court is convinced he was truthful. It is not hard to imagine a young thirteen year old boy having vivid memories of one of his first successful hunting expeditions. Nor is it difficult to believe that a young boy would be familiar with the well-worn path he took to work.

In addition, Mr. Kowalkowski's testimonial evidence is corroborated by other evidence. The distances from the section corners "to tie" on Exhibit M support his as-sertion that there was a post at the site of the claimed quarter. The rock pile, while not particularly significant in and of itself, takes on more significance because the rocks were placed there by hand and were of a type unlike other rocks in the area. Obviously, the rocks were placed there for a special purpose. It is reasonable to infer that the special purpose was to mark a corner.

Another factor supporting the Citkos' position is the location of the fence. That the fence runs over the claimed corner and has been in that location since the 1930's lends support to the Citkos' claim that the fence was a boundary fence.

Finally, another factor which has little significance by itself but becomes more significant when considered with the other evidence is the use of tamarack trees as bearing trees. Although tamarack trees are occasionally found in high areas, they are usually located in low lying areas. Thus, it is reasonable to infer that the original corner was located at the site of the claimed quarter corner because it is a low lying area.

Based on Mr. Kowalkowski's testimony and the evidence that supports that testimony, the Court finds that the claimed quarter corner is the original quarter corner.

### V. Conclusion

The decision reached in this case was reached after great consideration. As stated earlier, the Court believes that Mr. Resvick did an impeccable job in his physical search. He failed, however, to seek out live witnesses before determining the corner was lost. Had he consulted the witnesses and reexamined the survey testimony and other evidence in light of that testimony, the cohesive theory put forth by the Citkos may have become apparent to him.

Based on the foregoing, plaintiff's complaint is dismissed.