CASPER LODGE NO. 22, I. O. O. F., of Casper, Wyoming, a Wyoming Corporation,

*Plaintiff and Respondent,*

vs.

W. J. CORBRIDGE,

*Defendant and Cross-Petitioner,*
*and Appellant.*

(No. 2657; August 9th, 1955; 286 Pac. (2d) 1047)

For the appellant the cause was submitted upon the brief of Wm. H. Brown, Jr. and George M. Apostolos, both of Casper, Wyoming; oral argument by Mr. Brown.

For the respondent the cause was submitted upon the brief and also oral argument of Marvin L. Bishop, Casper, Wyoming.

248

## OPINION

HARNSBERGER, Justice.

Appellant is the owner of a brick building which had been constructed in three sections, each section being built at a different time. The first section was a one-story structure facing west, fronting on the street, approximately 50 feet in length and 33½ feet in width. The second section joined the rear of the first section. It also was a single-story structure, approximately 40 feet in length and 33½ feet in width, but beneath it there was a basement. The third or rear section joined the second section at its south rear and was 50 feet in length but only 16 feet in width. This last section was a two-story building and it also had a basement. The foundation walls on the south side of the building,

as finally completed, thus formed a continuous concrete wall extending 140 feet from street to alley, but the depth of the foundation varied due to there being a basement under the last two sections.

The appellant learned that respondent was about to erect a new lodge building upon lots which adjoined appellant's building to the south, and having in mind that he might build additional stories to his own building, he entered into a written agreement with respondent, the relevant substance of which expressed respondent's recognition of its obligation to protect appellant's building from any damage that might result from erection of the new lodge building. The agreement also noted the desire of the appellant to have the footings and foundation wall beneath the entire south side of the building enlarged and strengthened in order to provide adequate support for higher stories to the building. In consequence, it was provided that respondent undertake and perform the enlargement and strengthening of the south foundation walls to appellant's building, using what was referred to as the "alternate pit system" in the underpining operation necessarily involved in providing the desired additional foundation. For this service the appellant agreed to pay respondent the sum of $2,880. The respondent agreed to use all reasonable care and prudent means to avoid damage to appellant's building in the course of its building and construction operation, and the respondent's liability or responsibility for any damage to appellant's building or improvements resulting from the excavation or removal of support from under the appellant's building, was expressly acknowledged.

Following completion of the work, respondent billed appellant for the $2,880 which he had agreed to pay, and when the appellant failed to remit, respondent brought this action to recover the amount. Appellant's

answer admitted this indebtedness, but by cross-petition alleged respondent had breached its agreement by leaving the south wall of appellant's building without proper support during the underpinning operations; that this caused his building to settle; caused cracks in its walls and floors which required the expenditure of $2,360 for temporary repairs of the damage, and that it would require an additional $19,076 to make complete permanent repairs of the damage done. The appellant also asked a further recovery of $3,500 for damage caused to the roof of his building by the respondent's contractors and their employees having dropped hot rivets and throwing heavy tools, plaster and mortar thereon.

Pursuant to an order therefor, the appellant then filed a bill of particulars, itemizing the $2,360 which he claimed to have spent for the temporary repairs. These items included a charge of $932.05 listed as the cost of installing an accoustical tile ceiling in the south front section of appellant's building occupied by an insurance company, and a charge of $232 as the cost of a new floor covering in the same portion of the building.

The respondent denied the allegations of the cross-petition and the case was tried to the court which, after finding for the plaintiff-respondent on its $2,880 claim, found for the defendant-appellant on certain items of the damage claimed by his cross-petition, the total of which was the sum of $2,481.37. The court then rendered a judgment in favor of the plaintiff-respondent and against the defendant-appellant for the difference sum of $398.63. The defendant has appealed from that portion of the judgment, which awarded him only the sum of $2,481.37. The respondent suggests this is an appeal from a judgment favorable to

appellant, but it is plain that the judgment disallows certain items of damage claimed by appellant and fails to award damages in the amount prayed by his cross-petition, which is, of course, an unfavorable judgment to the appellant from his standpoint.

In arriving at the judgment, the court deducted from the $2,360 shown upon the bill of particulars, the item of $932.05 listed for the accoustical tile ceiling, and also deducted $116 as one-half the cost of new floor covering which was listed as costing $232. The court then added $19.42 as the reasonable cost of necessary ceiling plastering, had the accoustical tile ceiling not been installed. The court also added $800 as the reasonable cost of removing the old and installing a new cement floor in the south portion of the front section of the building occupied by the insurance company; added $50 as the reasonable cost of repairing a crack in the floor of the north portion of the front sections of the building occupied by a stationery store and added $300 as the reasonable cost of leveling and repairing the cement floor in the basement of the building. By brief, as well as in argument, both parties dwelt at length upon the question of whether or not appellant's building had been damaged by respondent's operations. The point is moot here because the award of damages to appellant carries with it a finding that appellant's building was so damaged, and the respondent has not appealed from that finding.

For purposes of this case, we may accept appellant's contention that the contract made respondent an indemnitor and liable for any and all damages to appellant's building, whether caused by underpinning operations or by other construction work prosecuted by the respondent in the erection of its new building. It makes little difference whether the damage occurred through

breach of contract or through negligence. The measure of damage in either case is the same.

The nature and extent of damage was a matter for factual determination and the amount of that damage, if any, measured in money, was also a matter of fact to be established in the usual and accepted legal manner. Our concern, therefore, is only with appellant's disagreement with the court's finding of fact respecting the nature, extent and value of the damage suffered. We will adhere to the oft repeated rule of this court, and look only to undisputed evidence and evidence most favorable to the successful party, giving to it all reasonable inferences, to ascertain if there is any substantial evidence to support the court's finding and judgment.

The testimony and evidence in behalf of appellant pictured the damage as having required the expenditure of $2,360 for "temporary" repairs and as requiring an estimated $14,568 worth of "permanent" repairs, plus another $3,000 to pay the expense of removing, storing and reinstalling stock, furniture and fixtures while the "permanent" repair was being made.

The items in the bill of particulars which were awarded appellant for the repairs already made, were —Roof $369.72, Door $11.58, Water Line $83.02, Walls and Ceiling $714.63, Window $5.50, and Waterspout $11.50.

The remaining items in the bill of particulars were $932.05, the cost of the new accoustical tile ceiling installed by the appellant which was disallowed in its entirety, and $232, the cost of the new asphalt tile covering which was laid in the south front room, one-half of which was disallowed.

The breakdown of other items claimed to be neces-

sary to make "permanent repairs" may be summarized as follows: $1,440 to replace 1,440 square feet of basement floor; $800 to replace floor in the south front room; $1,948 to install 3,680 square feet of celotex tile for the entire first floor, $6,263 to replace damaged brick work; $176 to repair the store front; $1,186 to cover 2,880 square feet of floor with asphalt tile; $414 to patch 2,346 square feet of plaster; $465 for roof repair; $15 to repair gutter and downspout; $12 to repair rear door; $1,144 for painting; $176 to rehang ceiling fixtures; and $3,000 as expense of removing, storing and reinstalling stock, furniture and fixtures.

The court having allowed appellant the full $800 asked to replace the floor in the south front room of the building, this item is, of course, eliminated from consideration.

There was no conflict in the evidence but that the linoleum floor covering was rather badly worn—was "worn out". It follows that the court's allowance of one-half the cost of a new asphalt floor covering is considered generous.

Appellant points out that although he had invited respondent's officers, members of the lodge, the architect and the contractors to inspect the building before the underpinning work was commenced, they did not to his knowledge take advantage of the offer. He apparently reasons therefrom that respondent and its employees were without the information necessary to enable them to make reliable or comparative appraisal of the extent or degree of the damage for which respondent should be held liable. However, at least one of respondent's witnesses testified that prior to the underpinning operation he had inspected the building with the exception of the upstairs of the rear section and

the rear storage room, which portions of the building were locked up. It does not, however, appear that any damage to these parts of the building were pointed out to the respondent's representatives as having suffered damage when they inspected the building in company with the appellant after the damage was supposed to have occurred for the purpose of being shown the claimed damage. A second witness stated he made a partial inspection of the building before the work started. Additionally there was testimony of other witnesses, indicating they had knowledge of the condition of the building previous to the occurrence of the claimed damage. There was also some testimony which indicated that by various differences in the appearance of cracks and other items of disrepair, the witnesses were able to distinguish between antecedent damage and new damage occurring coincident with and following the respondent's operations.

A fair summary of our understanding of some of the evidence favorable to the respondent and supporting the court's judgment is as follows:

The mechanic who repaired the front door after it was claimed to have been damaged, testified the door was sagging on the hinges and sticking; that a backing had worked out from in behind the jams, allowing the door to "slide down"; that this resulted from normal wear and tear, improper blocking in behind the butts and not enough shimming; that the hinges were worn and the pins were badly worn, so that to help straighten the door he bent the hinges to pull them close together in order to lift the door. This evidence would have justified a finding that the door condition was not due to the respondent's construction work but merely to original improper installation of the door and to ordinary wear and tear. Notwithstanding, the

judgment did allow the $11.58 which was included in the bill of particulars as the amount expended for the door's repair. This same witness also testified that the only cracks in the plastering of the insurance office at the time of his making repairs to the door, were hairline, small, or medium cracks.

An architect who inspected the building before the construction work testified he then observed hairline cracks, contraction cracks and perhaps cracks a little bit larger in the basement floor; that in the front part of the building occupied by the stationery store (the north side) he did not notice anything out of the usual with the floor; that there were some usual hairline cracks in the ceiling; that in the front part of the building occupied by the insurance agency he noticed a piece of material (a wood two-by-four) that was put in the concrete floor, and that there was a hole in the linoleum floor covering which enabled him to see the wood underneath; that there were normal hairline cracks in the ceiling and walls—some a little bit larger than hairline cracks and some could have been a sixteenth of an inch wide.

This same architect testified that after the construction work had taken place, but before the "temporary" repairs were made by appellant, he again inspected the building, and the appellant then pointed out to him a crack in the basement floor which ran parallel to the side of the building; that a question was raised as to whether this was a new or an old crack, but he was unable to determine the matter; that the door at the bottom of the stairs going down into the basement was an old homemade door in rather poor condition and that it was stuck; that in the back part of the stationery store salesroom, which was on the north side in the middle portion of the building, there were six hairline

cracks about six inches apart running across the ceiling and possibly there was a crack in the floor at the construction joint between the front portion and the middle part of the building; that in the insurance room at the south front of the building the ceiling had some hairline cracks and some cracks larger than hairline, a part of which however were old cracks as was indicated by the different colored plaster which had been used in previous patchings; that the floor in the insurance room was approximately the same as it had appeared on the witness' previous inspection trip, excepting that along the south wall the floor was one-half inch below the baseboard. This witness estimated that all the cracks in the insurance room and the stationery portion could be repaired and the whole of the insurance and stationery rooms repainted for between $300 and $500.

Another of respondent's witnesses made inspection of the building with the architect after the construction work but before the "temporary" repairs were made by appellant. He said the appellant did not show them the back part of the basement nor the second story apartment which were locked up; that he observed old hairline cracks in the walls and in the floor of the basement which had been there for years; that in the stationery portion in the north front of the building he saw only old cracks; that in the insurance room in the south front of the building there was a big crack on each side of the two-by-four imbedded in the floor and that the linoleum floor covering was worn out; that there were a lot of cracks in the walls and ceiling but some were small old cracks. This witness estimated the cost to repair the damage witnessed by him and claimed by the appellant at the time of the inspection, would not be very much—probably $300 for everything, including the floor repair. He also stated there were hair-

line cracks in the concrete floor of the rear portion of the building which was last constructed, but that there were no breaks or fractures in the concrete. It is unclear from the testimony, but it seems this referred to the basement floor. The witness also testified he noticed a crack on the south side of the insurance office which had been filled so many times it was sticking out, and that it was an old crack. Again, we assume this referred to either a crack in the ceiling or wall.

Another contractor said he examined the building before the construction work and had seen several cracks in the basement floor which were not serious cracks, and that after the construction he saw no more cracks in the basement floor than he had previously seen; that appellant pointed out cracks on the wall in the insurance office and he also saw unevenness in the floor and that the linoleum was worn off; that he could not see any plaster needing repair in the insurance office; that he was in the insurance office the day before testifying, which was, of course, after the "temporary" repairs had been made, and that the whole room was in fine shape for that type of a building; that the floor was covered with asphalt tile but that there was a hump where the two-by-four was located. He estimated that it would take less than $10 to even up the floor; that $83.02 was a reasonable cost to repair the water line, as was $370.72 a reasonable cost for the repair of the roof, both of which items were listed in the bill of particulars and allowed by the judgment. While not directly so stating, this witness indicated that the $5.50 for the repair of the window, $11.50 for the repair of the spout, $11.58 for the repair of the door, $714.63 for the plastering and painting, $232 for the asphalt tile laid, and the $932.05 for the accoustical tile installed, which items were so listed in the bill of particulars and allowed in the judgment, except

the $932.05 for the accoustical tile and one-half of the $232 for the floor covering, were all reasonable charges.

The witness further stated that in the basement of the middle portion of the building there was a crack along the south wall at the edge of the footing where the floor lapped over the top of the footing; that at that point the floor seemed to be loose, and apparently, there was no joint with the footing; that where the floor lapped over the footing it was not over one inch thick, which made a thin weakened edge over the footing which would be a natural condition for a contraction crack.

A painting contractor stated that in 1944 or 1945 he decorated the insurance office in the south front of the building, and at that time there was a general run of cracks all around the place—a large crack in the ceiling going in a north and south direction; that they had trouble with that crack a good many times, he having decorated the place a second time in 1948 when the same crack showed up again, and that after repairing the crack the second time it broke open again.

This brief summary of testimony given in respondent's behalf is sufficient to show the court was justified in its disallowance of the $932.05 for a new accoustical tile ceiling in the south front insurance office, especially as an undefined portion of $714.63 shown on the bill of particulars was allowed, plus an additional $19.42 for plastering and painting of the ceiling and the walls of that room, all of which indicates the court concluded the installation of the accoustical tile ceiling to have been an unnecessary and unjustified expense. Also this testimony adequately explains and justifies cutting in half the cost of the new asphalt tile floor covering which replaced the old linoleum which had been worn out. It sufficiently supports the

conclusion that the so-called "temporary" repairs, the cost of which were included in the judgment was, in fact, wholly adequate to compensate the appellant for all the damage suffered, except for the replacement of the floor in the south front insurance office, for which the judgment allowed an additional $800; the small repair to the floor deemed necessary in the stationery store for which $50 was allowed; and the repair of the crack in the basement floor for which $300 was allowed.

Appellant correctly states there is no specific evidence to justify the court's allowance of $19.42 for plastering, yet, he is mistaken in assuming that this in itself constitutes error. The evidence before the court gauged the repair cost of the damage to plaster to run all the way from the portion of the $714.63 listed in the bill of particulars for plastering and painting, and allowed by the court as such, plus the estimated $414 for additional plastering, together with the $932.05 spent for accoustical tile ceiling, claimed by appellant to be necessary to make a permanent repair, to the more modest figure of $300 testified to by respondent's witnesses, as the reasonable amount which would restore the whole damage to the plaster, take care of the painting, and also the floor repair. The figure $19.42 appears nowhere in the evidence. We do note, however, that $80.58 awarded for the plastering as listed in the bill of particulars, plus the $19.42, totals an even $100 for plastering. This may have been the court's estimate of the fair money value of the actual damage to plaster when the judge tried to correlate the extent and degree of damage with its repair value in the face of the extremes presented by the conflicting evidence. However, if more were needed, we remind appellant that although the record is silent about the matter, it was represented by both counsel in argument before

this court that the learned trial judge saw fit to and did view the premises in question, accompanied by counsel for the respective parties. The record being silent on the subject, we assume their presence indicated their consent to the view. We do not suppose appellant overlooked this opportunity to point out in detail every item of damage and disrepair claimed to be attributable to respondent's fault.

The text in 4 C.J.S. § 1210, pp. 1709, 1711, seems to say the general rule is that statements of counsel made in argument as to matters absent from the record, will ordinarily not be considered by the appellate court. However, it is also stated, that the rule is not one of universal or absolute application, and cases are cited where statements made in brief or argument, and conceded by the other side, have been considered as well as where counsel makes statements unfavorable to his case. See Union Central Life Ins. Co. v. Stevens, 143 Kan. Rep. 757, 57 P. (2d) 57, where the representation was undisputed, the court said it would be futile to send the case back in order to have the omitted matter included in the record. Also Giberson v. York County Mut. Fire Ins. Co., 127 Me. 182, 142 A. 481, where the exception to the rule was approved, although the court found it unnecessary to consider the statements and decided the case without resort to them, and Maley v. Mundy, 47 Tex. Civ. App. Rep. 630, 107 S.W. 905, where the statements were practically concurred in and were taken as correct although not in the record, as well as Dembeck v. Bethlehem Shipbuilding Corporation, 166 Md. 21, 170 A. 158 where the appellate court considered a lower court rule, not in the record, but which was set out in brief, and Louisville Woolen Mills v. Kindgen, 191 Ky. Rep. 568, 231 S.W. 202, where appellate court considered an undenied statement made in brief which was not part of the record.

If there are to be any exceptions to the general rule against an appellate court considering matter not appearing in the record, such exceptions should by all means include representation made to this court and joined in by the opposing side, that a view was taken of the premises in question, as that fact would most usually have appeared in the record only as a court reporter's notation appearing in the transcript of testimony.

It is said in 88 C.J.S. § 47, p. 122, with respect to a view by a jury that "a view may be granted where the view will furnish *in the thing itself* a distinctly additional source of proof." (Emphasis supplied.) And in 53 Am. Jur. § 1128, p. 784, it is stated "Even where a view is proper, it is generally held that the judge may not base his findings on the results of his observation alone, although in some jurisdictions, by analogy to the rule applied in the case of a view by a jury, a view of the premises by the judge is held to be evidence, and may be made a factor in the determination of the case. Under the latter theory, a judge's findings are entitled to great weight on appeal where he views the premises in controversy. * * *" See Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N.W. 647. Thus it is reasonable to say that the same considerations which are applicable to a view by a jury should equally well apply to a view by a judge. Birdwood Irr. District v. Brodbeck, 148 Neb. 824, 29 N.W. 2d 621; Carter v. Parsons, 136 Neb. 515, 286 N.W. 696. At all events there is some unanimity of opinion that where the judge does view the subject of controversy, his findings are entitled to great weight and will seldom be disturbed.

In Cannon v. Neuberger, 1 Utah 2d 396, 268 P. (2d) 425, 426, 427, it was said:

"However, much consideration must be given to the trial court's findings, inasmuch as the presiding judge saw and heard the witnesses, had a better opportunity to determine their knowledge of the facts testified to, to observe their demeanor indicating interest, prejudice, etc., and particularly inasmuch as he went upon the premises in question, and made first hand observations of conditions existing."

citing several Utah cases as well as Erickson v. Hudson, 70 Wyo. 317, 249 P.(2d) 523. The court continued at page 427:

"We hold simply that the evidence, independent of the trial judge's view of the premises, is sufficient to sustain the judgment. Considering conflicts in the evidence and the disparagement (disparity?) between plaintiff's personal contentions and the trial court's findings, it is manifest that the judge's first hand observations during the view weighed considerably in the court's interpretation of the evidence before it. Such is the purpose of a view of the premises by the trier of the facts." (Parenthesis ours.)

The text in 5 C.J.S. § 1656 (c), p. 687, says—"When facts are involved, the appellate court is extremely reluctant to disagree with the trial court, and the latter's findings are at all times given great weight or deference, particularly where the trial judge saw and heard the witnesses giving oral testimony, or has made a personal inspection of the person or thing to which the findings relate." The statement is supported by cases cited thereunder.

In Wright v. Locomobile Co. of America, 33 Cal. App. 694, 167 P. 407, the per curiam decision of the court noted that after hearing all the evidence and going into all of the technical facts, the trial judge visited the building in question and examined the premises himself. Under those circumstances it was held that where there was substantial conflict in the evi-

dence, the decision of the court below would not be reversed.

Section 451 of 53 Am. Jur. 354, under "Trial," points out there are two distinct lines of authority as to the purpose of a view. One holds a view is not part of the trial and the jury are not receiving evidence; that knowledge acquired by the view may be used only for the purpose of understanding the testimony of witnesses and determining the relative weight of conflicting testimony but that it may not be given the force of substantive evidence. The other holds the information obtained upon a view is evidence received in the trial and may be acted upon, providing there is other evidence to sustain the finding.

In this case it is unnecessary to decide the point. The testimony in this case sufficiently supports the judgment. The court was not compelled to accept either in whole or in part any one of the various conflicting statements made by witnesses as to the extent, nature or value of the damage. In Lauder v. Wright Inv. Co., 126 C.A. 2d 147, 271 P.(2d) 970, 972, it was said:

"* * * the trial judge was not required to accept it (the testimony) rather than the on-the-spot factual picture his own personal inspection of the area revealed. It was his responsibility also to draw any reasonable inferences from the situation thus disclosed, and to make a proper deduction from the facts. In practical effect, the court simply resolved the conflict between what he saw and the testimony he heard. This, of course, is binding on a reviewing court." (Parenthesis supplied.)

Here the judge viewed the subject of controversy and his reaction makes it obvious that because of what he saw he accepted in part and rejected in part some of the testimony given in behalf of each litigant. This exemplified at least one of the purposes of a view which

is to assist in gauging and estimating the reliability of the testimony given.

It is futile for appellant to suggest that the judge should not have believed his own eyes, or that he should have disregarded that which the judgment makes plain he saw. To accept such an idea would as logically require that photographic and other physical evidence brought into the courtroom be disregarded. We agree with the court in Mason v. Braught, 33 S.D. 559, 572, 146 N.W. 687, 691, that "no good reason has been shown why a trial judge may not, in a proper case, go outside of a courtroom and view an object that from its nature will not admit of its being brought into court."

The logic justifying a view was somewhat well stated in Manuta v. Lazarus, 104 Misc. Rep. 134, 171 N.Y.S. 1076, 1077:

"In this case, what was the more sensible course and the one more consonant with justice—to let the jury pass upon disputed testimony as to an existing material fact, with the chance of its deciding in favor of the contention supported by perjured testimony, or to take it to the place and let it see with its own eyes? I think that the verdict in this case answers the question. Of Course, it rarely happens that a situation is susceptible of being cleared up in this way, because most evidence relates to what has been said or done, or a situation which no longer exists at the time of the trial; but when it is possible to ascertain the exact truth by an ocular demonstration, I think that it should be done in the interest of justice, and in order to stop disputes at to things as to which there should be no disputes. A survey, properly qualified, of the premises, would have been—in fact was— received in evidence. A photograph, properly qualified, would have been received. Oral testimony as to their condition was received. Then why was it not proper to receive in the way indicated the premises themselves? If the copy, why not the original? I think that it was just in the same way that

real evidence is received. In fact, the view constitutes, in substance, real evidence. * * *"

Of the same tenor is Yeary v. Holbrook, 171 Va. 266, 198 S.E. 441, 445:

"There can be no difference in the proffer of objects to the jury in the courtroom and such exhibition by taking the jury to view such objects, when they are not susceptible of being brought into court."

In 2 Wigmore on Ev. (2d Ed.) 705, it is also said:

" * * * it is wholly incorrect in principle to suppose that an autoptic inspection by the tribunal does not supply it with evidence; * * * "

The question is not new here. In Erickson v. Hudson, 70 Wyo. 317, 329, 249 P.(2d) 523, 526, without mentioning whether things witnessed upon view, should or should not be considered as evidence, this court noted:

"The trial judge viewed the fence personally and evidently came to the conclusion that at least as cut down it would not in any way depreciate the value of the property. In view of that, his finding is of special weight * * * "

In Davis-Robinson v. Patee, 49 Wyo. 470, 477, 57 P. (2d) 681, 682, 683, there was no discussion of whether things witnessed upon view should or should not be considered as evidence, but the court did say, "It is to be observed that *in addition* to the evidence in the case being in the condition discussed above, the trial judge, as already has been noted, apparently with the consent of the parties, went to the premises of the owner and viewed the cement work which is the subject of this controversy. Under such circumstances, the findings of the trier of facts are entitled to especial weight and consideration in a reviewing court, and, to say the least, should not be set aside except for very

strong and excellent reasons * * * ". (Emphasis supplied.)

The opinion in Binning v. Miller, 60 Wyo. 114, 134, 146 P. (2d) 527, 533, stated:

"In considering the findings and judgment of the district court it may very well be recalled at this point that the trial judge personally inspected the dam and reservoir involved in this litigation. That being so it will suffice to mention our previous decision in Davis-Robinson et al v. Patee, 49 Wyo. 470, 57 P. 2d 681 * * * ".

Again, in Jacoby v. Town of City of Gillette, 62 Wyo. 487, 513, 174 P. (2d) 505, 515, this court said:

"It must not be overlooked either as heretofore mentioned that the record herein shows that the trial judge at the request of the litigants and in the presence of counsel for all parties inspected the premises involved in these law suits. * * * "

and proceeded to quote again the excerpt set forth above taken from Davis-Robinson v. Patee, supra. Still later in Hudson v. Erickson, 67 Wyo. 167, 183, 216 P (2d) 379, 384, further approval was given to the same statement.

In the face of these decisions we are not disposed to question the soundness of the lower court's findings as to either the nature or extent of the damages to appellant's building—nor do we agree with appellant that the court below was not warranted in fixing the damages in the amounts for which judgment was given.

In Shikany v Salt Creek Transp. Co., 48 Wyo. 190, 208, 209, 214, 45 P.(2d) 645, 651, 652, 654, where as here, it was argued that necessarily there was speculation on the value fixed by the trier of fact, reference to and quotation from Dyer v. Barnes, 128 Me.

131, 145 A. 741, 742, was made with approval. There the Supreme Court of Maine said:

" 'Where there exists a fixed standard or scale by which damages may be calculated, a jury will not be permitted to depart from it. * * * But no such standard is applicable to the case at bar. Damages were not liquidated, nor were they capable of being reduced to certainty by arithmetical calculation, so the criterion was how much the plaintiff deserved for drilling the well. He was allowed to express his opinion from personal knowledge of a transaction in the ordinary affairs of life. Snow v. Boston & Maine Railroad, 65 Me. 230. The jury in arriving at its own opinion, from the facts and circumstances and inferences and the opinion given in testimony, might accept the latter opinion at face value, or discredit it, wholly or in part. Snow v. Boston & Maine Railroad, supra.' "

Our court then commented upon one witness' testimony, saying at p. 654:

"True, the ordinary rule is that a verdict must be based upon the testimony in the case, and the modification of that rule, that the jury can apply their own knowledge to the facts in a case, is limited in extent. But that it can be applied as to matters upon which men in general have a common fund of knowledge and experience is just as settled as the main rule. 16 R.C.L. 303, 304; Wigmore on Ev. (2d Ed.) § 2570; 64 C.J. 1021-1024; Sedgwick on Damages (9th Ed.) § 171a."

Similarly here the judge was entitled to use his common sense and exercise a reasonable judgment in applying the conflicting testimonies as to the value of the damage he had ascertained.

Finding no reversible error in the lower court's judgment, it will be affirmed.

*Affirmed.*

RINER, C. J. and BLUME, J. concur.