R. D. DAME, Appellant (Defendant below),

Bruce Anderson et al., Defendants,

v.

E. T. MILESKI, Appellee (Plaintiff below).

No. 2848.

Supreme Court of Wyoming.

May 13, 1959.

340 Pac.2d 205

D. W. Ogilbee and Jack D. Emery, Casper, for appellant.

Elmer J. Scott, Worland, for appellee.

Heard before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

160

162

## OPINION.

Mr. Justice PARKER delivered the opinion of the court.

This is a suit to quiet title and to adjudicate the rights of the parties in a 1 percent overriding royalty interest in the oil and gas in certain Big Horn County lands. According to the uncontradicted evidence, D. L. McDonald and Stanley T. Wallbank were owners of a United States oil and gas lease on the lands. They assigned it to others, reserving a 1 percent overriding royalty in each McDonald and Wallbank; McDonald thereafter conveyed his 1 percent overriding royalty interest in the same lands three different times as follows:

(1) To R. D. Dame on February 11, 1952, which instrument was filed for record in the Land Office,[1] Bureau of Land Management, Department of Interior, Cheyenne, Wyoming, February 21, 1952, and was recorded in the Office of the County Clerk of Big Horn County on November 22, 1954.

(2) To Bruce Anderson on February 14, 1952, which instrument was recorded in the Office of the County Clerk of Big Horn County on June 17, 1953.

---

[1] Sometimes referred to by counsel as Land and Survey Office.

(3) To E. T. Mileski on November 6, 1952, which instrument was filed for record in the Land Office November 21, 1952, and was recorded in the Office of the County Clerk of Big Horn County on November 6, 1952.

Mileski, the last to purchase the said interest from McDonald but the first to record it in the county where the lands were situated, brought suit against Dame, Anderson, and Anderson's assignees, alleging purchase of the royalty interest for valuable consideration and in good faith. Dame filed an answer, counterclaim, and cross-petition, apparently relying upon the fact that the filing of his assignment in the Land Office constituted constructive notice to plaintiff. The other defendants defaulted.

Prior to the presentation of any evidence, defendant interposed what he later termed a speaking demurrer "in accordance with Sec. 3-1303(5)," W.C.S.1945, asserting that McDonald, grantor, was a necessary party to the action. This demurrer was overruled, and the case proceeded to trial. The court rendered judgment for plaintiff, specifically finding, inter alia, that the allegations of plaintiff's petition were true, that plaintiff had purchased in good faith the 1 percent overriding royalty from McDonald on November 6, 1952, and that plaintiff had no actual or constructive notice of adverse claims of defendant Dame at the time of purchase.

Basically the errors charged against the trial court in the rendering of judgment for plaintiff on his petition rather than for defendant on his cross-petition are: (1) The *finding* that plaintiff purchased in good faith for a valuable consideration and without notice of adverse claim of defendant Dame. (2) The *failing*

*to find* that (a) plaintiff was on notice of the prior assignment of defendant; (b) the interest in controversy was personal property rather than real property; (c) the instrument on which plaintiff relies is not one in a record chain of title giving him rights as a good-faith purchaser; and (d) plaintiff gave no valid consideration for the assignment.

Defendant first argues that there was a substantial defect of parties defendant, complaining because the court overruled his speaking demurrer. He does not undertake to define a speaking demurrer or to justify its employment, entirely overlooking the fact that a speaking demurrer has usually been held to be bad pleading. See 19 Am.Jur. Equity § 310; 41 Am.Jur. Pleading § 209; 71 C.J.S. Pleading § 256; and many excerpts from cases in 39A Words and Phrases, Speaking Demurrer, p. 74 ff. Instead, he cites cases from other jurisdictions tending to hold that where conflicting interest of plaintiff and defendant in their respective claimed holdings are acquired from the same person such person becomes an indispensable or necessary party. The cited cases are not sufficiently analogous in circumstances to be persuasive. Moreover, § 3-1305, W.C.S.1945, provided:

> "When any of the defects enumerated in section one hundred and thirteen [§ 3-1303] do not appear upon the face of the petition, the objection may be taken by answer; and if no objection be taken either by demurrer or answer, the defendant shall be deemed to have waived the same * * *."

In the present case the defendant made no attempt to immediately demur but answered instead and at that time raised no question regarding defect of parties defendant. Accordingly, even if there were a defect of

parties defendant the matter would have been waived prior to the time the case came to trial.

Defendant argues that the filing of his assignment with the Land Office constituted constructive notice and justifies his position on several different grounds. He points out that the Department of the Interior has the obligation of leasing public lands and is, accordingly, authorized to promulgate regulations therefor. He then calls attention to 43 C.F.R. § 192.141 (1954), which provides:

"* * * all instruments of transfer of a lease or of an interest therein, including assignments of working or royalty interests, and operating agreements, and subleases, must be filed for approval within 90 days from the date of final execution and must contain all of the terms and conditions agreed upon by the parties thereto * * *."

He goes on to say that the trial court and incidentally the parties to the action are bound to take judicial notice of the provisions of the regulations, citing South v. Wishard, 146 Cal.App.2d 276, 303 P.2d 805; Arnold v. Universal Oil Land Co., 45 Cal. App.2d 522, 114 P.2d 408; and Livermore v. Beal, 18 Cal.App.2d 535, 64 P.2d 987. Inasmuch as all of these cases emanate from the jurisdiction of California, the first matter of importance is to ascertain the statutory provisions as to judicial notice in that State. We find that § 1875, West's Annotated California Codes, Civil Procedure, states:

"Courts take judicial notice of the following facts:

*      *      *      *      *      *

"3. Public and private official acts of the legislative, executive and judicial departments of this state and of the United States, and the laws of the several states of the United States and the interpretation thereof by the highest courts of appellate jurisdiction of such states;"

The California cases cited by defendant are based upon this statute, Arnold v. Universal Oil Land Co., supra, having held, largely on the authority of Livermore v. Beal, supra, that the persons interested in the subject matter of the records and orders of executive departments of the United States are also charged with notice.

The Wyoming statute on judicial notice is as follows:

"Every court of this state shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States." § 3-3109, W.C.S.1945.

Comparison of these statutes discloses that the scope of judicial notice as to public records is, therefore, much more limited in Wyoming than in California.

The wisdom of various statutory provisions as to judicial notice may well be debatable. Persons favoring an enlarged area of administrative matters which a court can notice, without the necessity of taking evidence, point out the resulting facility in the trial of lawsuits. Those favoring more restricted assumption of facts by the courts insist that in these days of tremendously increased activities by executive and administrative bodies a litigant would, under broader statutes, be charged with knowledge of scores of activities of which he actually knew nothing. Be that

as it may, the wisdom of the procedure is not one for the courts but for the people through legislation. We are guided, as are the California courts, by the statute applicable to the jurisdiction. Accordingly, the California cases cannot be precedent on this phase of the question.

Defendant also quotes Schnee v. Schnee, 23 Wis. 377, 99 Am.Dec. 183, 185:

"* * * The last purchaser in such case may be, and no doubt is, chargeable with knowledge of any facts appearing by the records of the land-office at which he purchases, or of the general land-office, going to show the claim or title of the first purchaser. * * *"

It is significant to note the next sentence of the court's opinion:

"And the doctrine may, under some circumstances, perhaps, be carried somewhat farther; but it clearly does not apply to a case like this; and the authorities cited by counsel do not sustain his position. * * *"

Clearly, the pronouncement is dictum only and of such a general nature as to be of no help.

No other state cases are cited on this point, but defendant contents himself with reference to Interior decisions in which constructive notice of Federal records is discussed. Obviously, these cases dealing with Federal agency matters can have no bearing on this problem.

Defendant quotes a general reference to constructive notice in 39 Am.Jur. Notice and Notices § 7, wherein it is stated:

> "Constructive notice is the law's substitute for actual notice, intended to protect innocent persons who are about to engage in lawful transactions. *It is a legal inference from established facts and, like other legal presumptions, does not admit of dispute.* * * *" (Emphasis supplied.)

The statement hardly supports defendant's thesis. Where the law is as in California, the constructive notice does not admit of dispute. Where the law is as in Wyoming, there is, of course, the most serious dispute. The effect of the recording of an instrument as charging a subsequent purchaser with notice thereof is solely by reason of the statute to that effect and is necessarily confined. 5 Tiffany Real Property, 3 ed., p. 15; see also 5 Thompson on Real Property, 1924, p. 3 ff.

As his next point, defendant contends that plaintiff's overriding royalty is an interest in personalty and is therefore not subject to a suit to quiet title, citing 3 Summers Oil and Gas, perm. ed. 1938, p. 391:

> "In some oil and gas producing states the courts have not had the occasion to consider the nature of the oil and gas royalty interest. In a Wyoming case the court of that state said that unaccrued royalties reserved in an assignment of a permit to drill for oil and gas on public lands were personal property."

Defendant admits that Rue v. Merrill, 42 Wyo. 497, 297 P. 375, cited by Summers in support of his statement is not in point. He assumes that the author must have intended Oregon Basin Oil & Gas Co. v. Ohio Oil Co., 70 Wyo. 263, 248 P.2d 198—a violent assumption because the volume of Summers cited was written some fourteen years before the Oregon Basin case was de-

cided. In any event that case related to the gas-products tax on oil which this court specifically held to be a tax upon the severed product. Defendant in order to bring the instant case within the Oregon Basin doctrine insists that the assignment to Mileski granted only a right in the oil and gas which might be produced and saved and no right whatever in oil in place in the ground. This question was decided in Denver Joint Stock Land Bank of Denver v. Dixon, 57 Wyo. 523, 122 P.2d 842, 845, 849, 140 A.L.R. 1270, when in holding that a mortgage of land containing no reservation of oil and gas embraced a landowner's royalty, we considered the matter at length and said:

> "It is true, of course, that when oil and gas have been brought to the surface, they become personal property. State v. Snyder, 29 Wyo. 163, 197, 212 P. 758. And if the right under the deed to Eades consisted only of the right to receive a certain amount of oil, without reference to its source, then it might well be said that the right is one merely to personal property. But it consists of a right to receive the oil and gas from particular pieces of land. * * *

> \*     \*     \*     \*     \*     \*

> "Since the law on this subject is said to be still in the formative stage it may not be amiss to repeat and amplify some of the statements made in the earlier part of this opinion, indicating, perhaps, an independent or additional reason why interests such as herein involved should be considered real and not personal property * * *."

The royalty interests in the issue here relate to the certain land from which the oil or gas is to be taken, and under the Denver Joint Stock Land Bank of Denver case must be held to be real property and subject to the law relating thereto.

Defendant also urges that, according to the records of Big Horn County, there was a break in chain of title in Mileski's grantor at the time of the conveyance to him and for that reason plaintiff could not succeed. These contentions do not seem to be in accord with the pleadings since the petition specifically alleges McDonald and Wallbank to have been the owners of the United States oil and gas lease, Buffalo 037331, dated September 1, 1945; that McDonald and Wallbank assigned to Zigler, reserving 1 percent overriding royalty in each McDonald and Wallbank; and that Zigler thereafter obtained a preferential extension or renewal of said lease which preferential extension (Wyoming 02827) was subject to the same overriding royalty in favor of McDonald. Defendant in his answer and affirmative pleadings not only admitted these allegations but alleged them as his own, proceeding thereafter to assert the Dame assignment from McDonald in the lease, Wyoming 02827. Having stated his position in the pleadings, he cannot alter it at this time. See Casper Lodge No. 22, I.O.O.F., of Casper Wyoming v. Corbridge, 74 Wyo. 244, 286 P.2d 1047. From the pleadings, there seems to be no question that both parties trace their titles to a common grantor, McDonald. As we said in York v. James, 62 Wyo. 184, 165 P.2d 109, 162 A. L.R. 730, where parties in an action to quiet title each assert opposing claims to the property, the title need not be shown beyond the common grantor, and the rule requiring plaintiff to recover on the strength of his own title is inapplicable.

Defendant relies upon Rue v. Merrill, 42 Wyo. 497, 297 P. 375, 377, that "to enable one to claim the rights of a bona fide purchaser without notice, the title purchased must be apparently perfect and good at law." This rule is correct but it has no application here since

both parties by their pleadings concede that their predecessor in interest had good title.

Defendant argues that plaintiff paid no present valuable consideration for his assignment and was therefore not a bona fide purchaser for value. Plaintiff concedes that normally the cancellation of a preexisting indebtedness is not a valuable consideration but contends such cancellation coupled with the surrender of the evidence of the indebtedness and the payment before notice of substantial additional amounts is valuable consideration, citing 92 C.J.S. Vendor & Purchaser § 323b, p. 227, and 55 Am.Jur. Vendor & Purchaser § 743, for the proposition that a purchaser will be protected where part of the consideration was antecedent debt and the remainder a contemporaneous payment if said payment constitutes a substantial part of the entire amount to be paid. Whether one who takes property in satisfaction of a preexisting debt is entitled to protection as a bona fide purchaser for value is a question on which there has not been unanimity of view. See 55 Am.Jur. Vendor and Purchaser § 742 ff.; 92 C.J.S. Vendor & Purchaser § 323, pp. 227, 228; 3 Pomeroy's Equity Jurisprudence, 5 ed., § 748 ff.; and see 5 Tiffany Real Property, 3 ed., § 1302. Similarly, courts have experienced considerable difficulty regarding the protection which should be accorded a purchaser where a part only of the purchase price has been made before the purchaser receives notice of a prior claim against the property. See 3 Pomeroy's Equity Jurisprudence, 5 ed., § 750; 55 Am.Jur. Vendor and Purchaser § 750; and Annotations, 87 A.L.R. 1505, 1516, 1519; 109 A. L.R. 163, 167; 124 A.L.R. 1259, 1261; 21 Ann.Cas. 463.

Plaintiff's testimony regarding the consideration which was paid is of interest:

"Q. So you then took the whole assignment for what? A. Well, I took the whole one percent then for what he already owed me, which was $2,365.-00, plus $1,600.00, that I was to pay him on top of that one percent.

"Q. And how were you to pay the $1,600.00? A. Well, I told Dan I couldn't afford it. There wasn't any way I could give him any big sums of cash. He told me to pay it out as I could. Anytime he needed a little money, or any time I could spare it, I would pay that on account of that royalty.

"Q. Now, did you make payments on that $1,600? A. Yes I did.

"Q. Did you keep a record of those payments? A. Yes I did, keep a record.

"Q. What kind of a record was it? A. Well, I had a little book in the safe. Every time I gave him any money or anything, why I put it down in that little book.

"Q. In addition to money did you give him anything else? A. Yes, he received on his own request, he received merchandise in the way of guns and fishing tackle, and little horse statuettes merchandise that he could sell to get a little money to go on.

"Q. How soon after the assignment did you start paying him? A. Immediately."

Plaintiff continued with the discussion of the amounts which he had paid and later the following ensued:

"Q. Now, can you look at that record down at the bottom of the page. There appears a notation 'balance due $397.10 9/2/54 to McDonald.' Can you tell me what that means? A. Yes, that is the

balance of $1600 cash I was supposed to pay Dan for the one percent royalty. That is the balance that was still left for me to pay on this particular date.

"Q. On the date of September 2, 1954? A. That is right.

"Q. Now can you look at the record and tell me when it was you completed paying the $1600? A. Yes, the balance; in fact, it was not only paid but overpaid actually on November 24th, 1954.

"Q. How was it paid? A. Well, there was $274 for merchandise, fishing tackle, guns etc., Mc-Donald requested me to bring to Billings, and there was $187.70 in cash, and then there was a $25.00 check as well that was paid to him at that time. If you will notice on here it is overpaid to him to the extent of $111.00."

This testimony was flatly contradicted by McDonald, and it therefore became necessary for the trial court to determine which of the witnesses was worthy of belief. We must consider the evidence most favorable to the prevailing party here under the rule which we have often announced. Holbrook v. Continental Oil Co., 73 Wyo. 321, 278 P.2d 798; Lasich v. Wimpenney, 73 Wyo. 345, 278 P.2d 807; Tompkins v. Byrtus, 72 Wyo. 537, 267 P.2d 753; Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P.2d 505, 177 P.2d 204, 169 A.L.R. 502. So considering we have no alternative but to conclude that if the trial court believed Mileski there was ample evidence upon which the finding and judgment of the court could be predicated. The detached sheets of the book, plaintiff's Exhibits 4a and 4b, which purported to show the amounts of money paid by Mileski to McDonald were received in evidence. Defendant objected on the ground that they were not

proper business records and that no proper foundation had been laid for their admission, but his objection was overruled. These exhibits are somewhat irregular, but we think a proper foundation was laid when it was said that these sheets were the original record of payments and that the record was true and correct and that "Every time I gave him any money or anything, why I put it down in that little book." If defendant desired to challenge the statements, he should have done so. The proper weight to be given to such evidence was a matter within the discretion of the trial court. According to Exhibits 4a and 4b, there was still due on November 22, 1954, the date of the recording of the Dame assignment, a balance of $187.70 still unpaid on the $1,600 amount which Mileski claimed to be the cash consideration he had promised McDonald. However, Mileski stated that he learned of the previous sale of the royalty to Dame "about two or three weeks before Christmas, 1954." If the trial court believed this testimony to the exclusion of all conflicting statements, it might properly have concluded that Mileski had paid all of the promised $1,600 cash consideration for the assignment from McDonald before becoming aware that the previous assignment to Dame was in existence. Assuming this to be true, we need not determine whether or not a pre-existing indebtedness is such consideration as will protect a bona fide purchaser without notice.

The parties do not discuss the fact of there being a balance of $187.70 due from Mileski to McDonald at the time the assignment to Dame was recorded, but perhaps the case should not be concluded without reference thereto. It is stated in 3 Pomeroy's Equity Jurisprudence, 5 ed., § 759b:

"Where the subsequent grantee or mortgagee whose deed or mortgage is first recorded has, at the time of payment of part or all of the consideration, constructive notice of the prior interest, arising from the intermediate recording of the prior deed or mortgage, the question has arisen as to which title or right is superior, and on this question different conclusions have been reached. It will be observed that differences in the recording laws may conceivably affect the result. On the one hand it has been held that the subsequent purchaser, to obtain priority, must show that the purchase money was actually paid. before the recording of the prior conveyance or equities. On the other hand it has been held that payment of the purchase price before actual notice of the prior purchase is sufficient to protect a subsequent purchaser who has first recorded his deed, since the record of the prior purchase is not in itself sufficient to give notice to one who has recorded his deed."

And see 55 Am.Jur. Vendor and Purchaser § 750. In considering this matter as relates to the law of this State, we bear in mind the provisions of § 66-116, W. C.S.1945:

"Each and every such deed, mortgage, instrument or conveyance touching any interest in lands, made and recorded, according to the provisions of this chapter [article], shall be notice to and take precedence of any subsequent purchaser or purchasers from the time of the delivery of any such instrument as [sic] the office of the register of deeds, for record. * * *"

and § 66-119, W.C.S.1945:

"Every conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as against any subsequent purchaser or purchasers in good faith

and for a valuable consideration of the same real estate or any portion thereof, whose conveyance shall be first duly recorded."

In the light of the general law on the subject, the cases cited in support thereof, subsequent cases which have referred to such citations, and the above-mentioned Wyoming statutes, we conclude that plaintiff under the facts here was not bound by the notice of defendant's recording of assignment on November 22, 1954.

Affirmed.